OPINION OF THE COURT
Wallace R. Cotton, J.
Motion by the petitioner, Carmen Sanchez, to stay arbitration of a medical malpractice claim, demanded by the respondent, Meredith Sirmons, M.D., is granted.
The respondent is a medical doctor duly licensed to practice medicine in the State of New York. On June 28, 1980, he performed an elective abortion on the petitioner at his Manhattan office. Petitioner, alleging that she was the victim of an act of medical malpractice committed during the performance of the abortion, subsequently commenced a personal injury action against the respondent on July 20, 1982. Issue in the personal injury lawsuit was joined on September 13, 1982. However, on October 22, 1982, the named defendant therein, Dr. Sirmons, who is the respondent in the instant proceeding, served a demand for arbitration of the alleged medical malpractice dispute upon the plaintiff, Ms. Sanchez, the petitioner herein.
Dr. Sirmons’ demand for arbitration is predicated on paragraph 9 of the “Consent To Abortion” form which Ms. Sanchez had signed on the morning the abortion was *250 performed. Paragraph 9 states that “I agree that any dispute or claim which I may have relating to the abortion or any related medical procedure or any consequences thereof shall be determined solely by arbitration under the auspices and pursuant to the rules and regulations of the American Arbitration Association.”
In response to Dr. Sirmons’ arbitration demand, the petitioner, Ms. Sanchez, moved to stay arbitration. The motion was heard by a court of co-ordinate jurisdiction which directed that the matter be referred to this court for the purpose of conducting a preliminary trial to determine “the validity and enforceability of the arbitration clause in question” (see order dated Jan. 17,1983 issued by the Hon. Irwin M. Silbowitz).
Based upon the credible testimony and documentary evidence adduced during the trial of the instant proceeding, I find that Dr. Sirmons may not fairly demand arbitration of the malpractice action brought against him by Ms. Sanchez.
When the petitioner appeared at the respondent’s office on June 28, 1980 to undergo the abortion, it was the first time she had ever been to his office. Upon her arrival there, the doctor’s receptionist gave her various forms and papers to complete and sign. One of the papers the petitioner was asked to read and sign was entitled “Consent To Abortion” which contained the following provisions:
“1.1, Carmen Sanchez, do hereby give my authorization and consent to an abortion to be performed upon me on or about by Dr. Sirmons.
“2. I certify that I understand the meaning of the word abortion or termination of pregnancy.
“3. I further certify that I am seeking this procedure of my own free will and that no coercion has been used.
“4. I consent to the administration of anesthetics to be applied by or under the direction of the Doctor, and the use of such anesthetics as he may deem advisable in my case.
“I also consent that said Doctor preceding and following the operation, perform any other procedure or treatment which is deemed necessary or desirable in order to perform the abortion.
*251 “5. Recognizing that an abortion requires the cooperation of technicians, Nurses, Assistants, and other personnel, I give my further consent to administrations and procedures on my body by all such qualified personnel working under the supervision of said Doctor before, during and after the operation to be performed.
“6. Despite the great technical strides that have been made over the past decades, the practice of medicine is still an art and not a science. I have not been given any guarantee or promises of complete success and satisfaction from the procedure.
“7. I have been informed that the risks of the abortion procedure occur in less than 0.5%. These risks are possible retained placental tissue, bleeding, infection or perforation.
“8. I acknowledge that no guarantee or assurance has been made by anyone regarding the operation which I have requested and authorized.
“9. I agree that any dispute or claim which I may have relating to the abortion or any related medical procedure or any consequences thereof shall be determined solely by arbitration under the auspices and pursuant to the rules and regulations of the American Arbitration Association.
“10. I agree that this Consent To Abortion shall be binding upon me and my heirs, executors, and administrators.
“11. I, the undersigned, grant permission to release an abstract of my Medical Record to my designated Doctor.
“Witness:__________ Name of Patient/s/ Carmen Sanchez
“Date: 6/28/80______ Name of Parent: Tomasa Sanchez
Guardian if Minor: ______”.
The petitioner, who was 27 years old when the abortion was performed, testified that she signed the consent to abortion agreement but did not study its numerous provisions, even though she is able to read and understand the . English language, because she thought that she was only giving her consent to submit to an abortion.
Dr. Sirmons maintains that paragraph 9 of the agreement, quoted supra, is dispositive of the motion. However, *252 he candidly admitted in his testimony that no one in his office informed the petitioner that upon signing the “Consent To Abortion” contract she waived her legal right to trial by jury. Nor did he himself, or any member of his office staff, explain to her the meaning of any of the other paragraphs set forth in the agreement which the petitioner was requested to sign.
Initially, the court rejects the petitioner’s contention that the arbitration agreement is unenforceable because it constitutes a contract of adhesion. The essence of an adhesion contract is that it is offered on a take it or leave it basis to a consumer who has no realistic bargaining strength and cannot obtain the desired services or goods elsewhere without consenting to the identical contract terms (Matter of K. D. v Educational Testing Serv., 87 Misc 2d 657, 662). That is not the case here. The petitioner, not confronted with a medical emergency, could have obtained an elective abortion elsewhere at countless other health facilities in the metropolitan area without being compelled to arbitrate any alleged malpractice claim arising from its performance.
Also, the court notes that the resolution of medical malpractice disputes by arbitration cannot be regarded as offensive to public policy since several States have enacted legislation which permit its use (Alaska, California, Maine, Michigan, Ohio and South Dakota). Although the New York Legislature has not as of the present time spoken on the subject, our appellate courts have enforced a dental patient’s written consent to arbitrate an alleged malpractice claim where the patient executed the agreement after she acquired knowledge of the facts which gave rise to the alleged claim (Zupan v Firestone, 91 AD2d 561, affd 59 NY2d 709).
Nevertheless, the arbitration clause embodied in the “Consent To Abortion” form cannot be invoked to compel arbitration in the case at bar because it has not been demonstrated that the petitioner made an informed and knowledgeable waiver of her constitutional right to trial by jury (Note, Medical Malpractice Arbitration: A Patient’s Perspective, 61 Wash Univ LQ 123,144). As will be seen infra, the arbitration contract here suffers from sev *253 eral infirmities which, in all fairness, preclude the court from sanctioning its validity.
It must be recognized that “[t]he manifest objective of a medical entity in including an arbitration clause is to avoid a jury trial and thereby hopefully minimize losses for any medical malpractice and correspondingly to hold down the amount of any recovery by the patient. (See Henderson, Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice, supra, 58 Va.L.Rev. 947, 994, and particularly fn. 194)” (Wheeler v St. Joseph Hosp., 63 Cal App 3d 345, 361). However, access to the court system is a fundamental constitutional right, “founded in the Due Process Clause [US Const, 14th Arndt] and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental rights Wolff v McDonnell, 418 US 539, 94 S Ct 2963” (Morris v Metriyakool, 107 Mich App 110, 117).
In order to effectively waive a fundamental constitutional right, there must be a knowing, voluntary and intelligent waiver (Johnson v Zerbst, 304 US 458, 464). Courts are to indulge every reasonable presumption against the waiver of such rights (Johnson v Zerbst, supra, p 464). This principle is applicable to civil actions as well as criminal proceedings (Moore v Fragatos, 116 Mich App 179). Therefore, “[t]he law ought not to decree a forfeiture of such a valuable right where the patient has not been made aware of the existence of an arbitration provision or its implications. Absent notification and at least some explanation, the patient cannot be said to have exercised a ‘real choice’ in selecting arbitration over litigation” (Wheeler v St. Joseph Hosp., 63 Cal App 3d 345, 361, supra).
Moreover, the circumstances under which the agreement was signed must also be taken into consideration. “The exigencies of a patient’s physical or mental distress may * * * interfere with a voluntary and rational election of arbitration” (Note, Medical Malpractice Arbitration: A Patient’s Perspective, 61 Wash Univ LQ 123, 145).
In the case now before the court, the arbitration clause was concealed (albeit unintentionally) in a form entitled “Consent To Abortion”. A person viewing a form labeled as *254 such could easily be misled, as the petitioner was here, into believing that it is a self-explanatory form which only authorized the surgeon to perform the abortion. In order to be binding, the arbitration provision should have been called to the petitioner’s attention and she should have been given a reasonable explanation of its meaning and effect, including an explanation of any other available options (Wheeler v St. Joseph Hosp., supra). Unquestionably, this was not done by either Dr. Sirmons or his assistants.
“Notice and understanding of the arbitration agreement and its consequences are so important that some state legislatures require in their malpractice statutes that prescribed notice forms be included in arbitration agreements * * * To ensure that the patient understands the arbitration agreement, some laws also require that the patient be furnished an explanatory booklet along with the arbitration option” (Note, Medical Malpractice Arbitration: Time for a Model Act, 33 Rutgers L Rev 454, 468-469).
The California statute (Cal Civ Pro Code, § 1295) requires that any provision for arbitration of a medical malpractice claim must be contained in the first article of the contract. More significantly, the California law further provides that:
“[i]mmediately before the signature line provided for the individual contracting for the medical services must appear the following in at least 10-point bold red type:
“notice: by signing this contract you are agreeing to HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT” (Cal Civ Pro Code, § 1295, subd [b]).
Thus, it is readily apparent that the arbitration clause under consideration in the instant proceeding would be unenforceable under California law, as well as in other States (see Note, Medical Malpractice Arbitration: Time for a Model Act, 33 Rutgers L Rev 454, 469, n 99) because it did not comply with minimum standards to ensure that the petitioner was sufficiently apprised with adequate notice that she was surrendering a precious fundamental legal *255 right secured by the United States Constitution (i.e., trial by jury).
Furthermore, the court has serious reservations about the enforceability of an arbitration clause in a contract between physician and patient where, as here, the patient’s consent was procured a few hours prior to surgery. It is only the unusual patient who faces surgery without fear and trepidation. The anxiety produced by thoughts of soon entering the operating room, an unfamiliar setting, and the ever present possibility of an untoward result, create an inappropriate atmosphere in which to thrust upon a patient for the first time the burden of analyzing documents containing an arbitration provision inconspicuously embodied therein. A patient being wheeled into the operating room should not have to contemplate the pros and cons of litigating the surgeon’s alleged mistakes before a tribunal of arbitrators rather than before a jury in a court of law.
Thus, not surprisingly, some States which have enacted legislation authorizing the arbitration of medical malpractice claims mandate that the arbitration contract contain a provision that it may be rescinded by the patient within 30 days after signature (Cal Civ Pro Code, § 1295, subd [c]; Ohio Rev Code Ann, tit 27, § 2711.24 [allowing patient to revoke agreement within 60 days after termination of the physician-patient relationship]; see other statutes cited in Note, Medical Malpractice Arbitration: Time for a Model Act, 33 Rutgers L Rev 454, 485, n 247).
In conclusion, the arbitration clause contained in paragraph 9 of the “Consent To Arbitration” form, drafted by the respondent doctor, is invalid and unenforceable. The arbitration agreement was not set forth in a separate piece of paper with the petitioner patient further being alerted by distinctive large bold-type print that she was surrendering her right to litigate a malpractice claim before a jury. Thus, it cannot be said that the petitioner made a conscious and deliberate decision to consent to arbitration. Moreover, the agreement was voidable inasmuch as it did not afford the petitioner a reasonable period of time to reflect and deliberate whether she should have revoked the arbitration contract after it was executed.
*256 Accordingly, the petitioner’s motion to permanently stay arbitration is granted (also see Miner v Walden, 101 Misc 2d 814; O’Keefe v South Shore Internal Medicine Assoc., 102 Misc 2d 59; Hubbard v Cohen, NYLJ, March 21,1980, p 12, col 6; Arbitration of Medical Malpractice Claims, Ann., 84 ALR3d 375).