**K.M.C. CO., INC., Plaintiff-Appellee,**

v.

**IRVING TRUST COMPANY,
Defendant-Appellant.**

No. 83–5563.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 11, 1984.

Decided March 4, 1985.

Jack B. Draper, Arnett, Draper & Hagood, Knoxville, Tenn., Peter H. Kaminer (argued), John F. Pritchard, Winthrop, Stimson, Putman & Roberts, New York City, for defendant-appellant.

William D. Vines, III (argued), Butler, Vines, Babb & Threadgill, James C. Wright, Knoxville, Tenn., for plaintiff-appellee.

Harold Krent (argued), Justice Dept., Washington, D.C., for intervenor.

Before KENNEDY and KRUPANSKY, Circuit Judges, and DeMASCIO, District Judge.[*]

CORNELIA G. KENNEDY, Circuit Judge.

Irving Trust Company (Irving) appeals from a judgment entered against it in this diversity action for breach of a financing agreement. K.M.C. is a Tennessee corporation headquartered in Knoxville and engaged in the wholesale and retail grocery business. In 1979, Irving and K.M.C. entered into a financing agreement, whereby Irving held a security interest in all of K.M.C.'s accounts receivable and inventory and provided K.M.C. a line of credit to a maximum of $3.0 million, increased one year later to $3.5 million at a lower rate of interest, subject to a formula based on a percentage of the value of the inventory plus eligible receivables. On March 1, 1982, Irving refused to advance $800,000 requested by K.M.C. This amount would have increased the loan balance to just under the $3.5 million limit. K.M.C. contends that Irving's refusal without prior notice to advance the requested funds breached a duty of good faith performance implied in the agreement and ultimately resulted in the collapse of the company as a viable business entity. Irving's defense is that on March 1, 1982, K.M.C. was already collapsing, and that Irving's decision not to advance funds was made in good faith and in the reasonable exercise of its discretion under the agreement.

* Honorable Robert E. DeMascio, United States District Court for the Eastern District of Michigan, sitting by designation.

Trial was conducted by a Magistrate on consent of the parties pursuant to 28 U.S.C. § 636(c). Although the financing agreement contained a jury trial waiver clause, the Magistrate ordered a jury trial over defendant's objection. He based his decision upon the statement of plaintiff's president Leonard Butler, that Butler was told by a representative of Irving prior to signing the agreement that absent fraud, which was not present in the instant case, the waiver provision would not be enforced. The jury found Irving liable for breach of contract and fixed damages at $7,500,000 plus pre-judgment interest. Defendant's motions to dismiss and for a directed verdict and post-trial motions for judgment n.o.v., a new trial or a remittitur were denied.

Irving has raised several issues on appeal. First, it suggests that 28 U.S.C. § 636(c) permitting a Magistrate to conduct civil trials with the consent of the parties is unconstitutional. Second, it contends that the Magistrate erred in denying Irving's motion to strike plaintiff's demand for a jury trial. Third, it argues that it did not in fact breach the financing agreement with K.M.C., and that the jury's verdict is not supportable in law and is contrary to the weight of the evidence. Finally, it asserts that the Magistrate erred in admitting incompetent expert testimony on the question of damages.

## I. Constitutionality of § 636(c) of the Magistrates Act

■ The essence of appellant's constitutional argument is that the Magistrates Act improperly confers the judicial power of the United States as exercised under Article III of the Constitution on an Article I court, and that since Article III is concerned with subject matter jurisdiction, this infirmity cannot be corrected by the consent of the parties. The only opinion to so hold, *Pacemaker Diagnostic Clinic of*

*Am., Inc. v. Instromedix, Inc.,* 712 F.2d 1305 (9th Cir.1983), has been vacated by the Ninth Circuit, *see* 725 F.2d 537 (9th Cir.1984) (en banc). In all, challenges to the constitutionality of § 636(c) thus far have been rejected by eight circuits.[1] We agree with the carefully reasoned opinions in these cases upholding the validity of the Act, and acknowledge the authority of the Magistrate to try the issues here involved with the consent of the parties.

## II. Jury Trial

The final sentence of ¶ 11 of the financing agreement between Irving and K.M.C. states that each party to the agreement "waives all right to a trial by jury in any action or proceeding relating to transactions under this Agreement." Irving contends that since the financing agreement between the parties was an integrated and unambiguous contract, the parol evidence rule should bar consideration of testimony purporting to vary or contradict express terms of the contract.

■ It is clear that the parties to a contract may by prior written agreement waive the right to jury trial. *See Smith-Johnson Motor Corp. v. Hoffman Motors Corp.,* 411 F.Supp. 670, 675–77 (E.D.Va. 1976); *c.f. D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 184–85, 92 S.Ct. 775, 781–82, 31 L.Ed.2d 124 (1972) (due process rights to notice and hearing prior to a civil judgment are subject to waiver). However, the Magistrate correctly observed that the question of right to jury trial is governed by federal and not state law. *See Simler v. Conner,* 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963); *Shu-Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 n. 5 (2d Cir.1984). He reasoned that the constitutional right to jury trial may only be waived if done knowingly, voluntarily and intentionally, and that whether this standard was met in a

1. *See Fields v. Washington Metropolitan Area Transit Authority,* 743 F.2d 890 (D.C.Cir.1984); *Goldstein v. Kelleher,* 728 F.2d 32 (1st Cir.1984); *Collins v. Foreman,* 729 F.2d 108 (2d Cir.1984); *Wharton-Thomas v. United States,* 721 F.2d 922 (3d Cir.1983); *Puryear v. Ede's Ltd.,* 731 F.2d 1153 (5th Cir.1984); *Geras v. Lafayette Display Fixtures, Inc.,* 742 F.2d 1037 (7th Cir.1984); *Lehman Bros. Kuhn Loeb Inc. v. Clark Oil & Refining Corp.,* 739 F.2d 1313 (8th Cir.1984) (en banc); *Pacemaker* (9th Cir.).

given case is a constitutional question separate and distinct from the operation of rules of substantive contract law like the parol evidence rule. *Cf. Overmyer,* 405 U.S. at 183, 185–86, 92 S.Ct. at 781, 782 ("[m]ore than mere contract law ... is involved" in determining whether waiver was effective under applicable standard); *Sambo's Restaurants, Inc. v. City of Ann Arbor,* 663 F.2d 686, 690 (6th Cir.1981) (quoting *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966)) (contractual waiver of first amendment rights).

Initially, we consider Irving's argument, raised for the first time on appeal,[2] that it was incorrect for the Magistrate to apply the knowing and voluntary standard in the instant case. Irving is correct in stating that in *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the Supreme Court, in applying the knowing and voluntary standard to a waiver of due process rights in a conditional sales agreement, cautioned that it was "not holding that [the] standards [governing waiver of constitutional rights in a criminal proceeding] must *necessarily* apply." 407 U.S. at 94, 92 S.Ct. at 2001 (emphasis added).[3] Irving then goes on to state that "in *Schneckloth v. Bustamonte,* 412 U.S. 218, 237 [93

S.Ct. 2041, 2052–53, 36 L.Ed.2d 854] (1973), the Court stated that the application of the requirement of a knowing and intelligent waiver was limited 'to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial.' " The Court in *Schneckloth,* however, did not purport to address the waiver standard applicable in criminal vis-a-vis civil cases. Rather, it was distinguishing expressly between waiver of rights necessary to preserve a fair trial, such as the rights to counsel, confrontation, speedy trial, *and jury trial,* and other rights, such as freedom from unreasonable search and seizure.

█ Those cases in which the validity of a contractual waiver of jury trial has been in issue have overwhelmingly applied the knowing and voluntary standard. *See, e.g., National Equipment Rental, Ltd. v. Hendrix,* 565 F.2d 255, 258 (2d Cir.1977); *N. Feldman & Son, Ltd. v. Checker Motors Corp.,* 572 F.Supp. 310, 313 (S.D.N.Y.1983); *Dreiling v. Peugeot Motors of Am., Inc.,* 539 F.Supp. 402, 403 (D.Colo.1982); *Sanchez v. Sirmons,* 121 Misc.2d 249, 467 N.Y. S.2d 757, 760 (1983). We are of the opinion that the Magistrate was correct in applying the knowing and voluntary standard in this instance.[4]

---

**2.** *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 143, 87 S.Ct. 1975, 1985, 18 L.Ed.2d 1094 (1967) ("even constitutional objections may be waived by a failure to raise them at a proper time" (citation omitted)). The jury trial issue was argued three times to the Magistrate, twice prior to and once post-trial, and Irving never questioned his application of the knowing and voluntary standard. Rather, Irving argued that the jury waiver *was* knowingly and voluntarily entered into and that, although a constitutional right is involved, a jury waiver clause retains its character as a contract provision to which the normal rules of contract interpretation should apply.

**3.** The Court did state that "a waiver of constitutional rights in any context must, at the very *least,* be clear. 407 U.S. at 95, 92 S.Ct. at 2002 (emphasis in original).

**4.** Although the point was not raised by Irving, we were initially troubled by the apparent inconsistency between application of a knowing and voluntary standard to contractual waiver of jury trial, and waiver by mere inadvertence un-

der Fed.R.Civ.P. 38(d), which provides that failure to file a timely demand constitutes waiver of trial by jury. Fed.R.Civ.P. 39(b) allows the court in the exercise of its discretion to relieve a party of its failure to make a timely jury trial demand. However, "it is settled today that the mere statement of 'oversight' or 'inadvertence' does not suffice to invoke the discretion of the court." 5 Moore's Federal Practice ¶ 39.09, at 39–30 (2d ed. 1984) (footnote omitted). *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2321, at 101 & n. 52 (1971) (Because "waiver is found even though it was inadvertent and unintended," "it is clear that the test of waiver that is applied to other constitutional rights ... is not applicable to trial by jury." (footnotes omitted)).

We are convinced, however, that there is a sound rationale underlying the application of different standards in the two instances. There is a significant distinction to be drawn between a contractual waiver entered into before any cause of action has arisen, and a party's procedural default once litigation has commenced in a particular case. The Supreme Court has rec-

In any event, whether the appropriate standard is that K.M.C.'s waiver must have been knowing and voluntarily, or merely "clear," *Fuentes,* 407 U.S. at 95, 92 S.Ct. at 2002, we conclude that if in fact it was represented to K.M.C.'s president Butler before the signing of the financing agreement that the jury waiver provision would not be enforced under circumstances such as those in the instant case, neither standard is met. It necessarily follows from this conclusion that the parol evidence rule may not bar proof that such a representation was made.[5]

Irving observes that in none of the cases addressing contractual waiver of jury trial and other constitutional rights were alleged oral representations the basis for a finding that the waiver was invalid, but rather that only objective circumstances were considered. *Compare Fuentes,* 407 U.S. at 95, 92 S.Ct. at 2001 (waiver not bargained over, unequal bargaining power, contract of adhesion); *National Equipment Rental,* 565 F.2d at 258 (unequal bargaining power, clause buried inconspicuously in contract) *and Dreiling,* 539 F.Supp. at 403 (unequal bargaining power, waiver not bargained over) *with Overmyer,* 405 U.S. at 186–87, 92 S.Ct. at 782–83 (sophisticated parties, equal bargaining power, consideration exchanged for waiver); *Feldman,* 572 F.Supp. at 313 (provision clearly visible, agreement bargained over); *United States v. Mountain Village Co.,* 424 F.Supp. 822, 825 (D.Mass.1976) (sophisticated parties, consideration exchanged for waiver) *and Global Industries, Inc. v. Harris,* 376 F.Supp. 1379, 1382 (N.D.Ga.1974) (equal bargaining power, contract prepared by party seeking to avoid waiver). It complains that if Butler's statement is admitted, it is being forced to shoulder the impossible burden of proving or rebutting the subjective understanding of the party seeking to invalidate the waiver of a constitutional right. However, the explanation of the clause allegedly given by Irving's representative to Butler of K.M.C. is no less an "objective circumstance" than whether or not the parties bargained over a particular provision. In none of the cited cases were oral representations varying the express language of the contractual waiver alleged. This case is not like *Global Industries* and *Mountain Village,* in which the party seeking to escape the waiver provision claimed that it did not intend or understand that in signing the contract there at issue it was waiving jury trial or some other right, and the court regarded that allegation as insufficient to overcome an inference from the objective circumstances surrounding the signing of the contract that the waiver was in fact knowing and voluntary.[6]

ognized in criminal cases that constitutional rights may be subject to procedural default in the interests of "the orderly administration of criminal justice." *Francis v. Henderson,* 425 U.S. 536, 539, 96 S.Ct. 1708, 1710, 48 L.Ed.2d 149 (1976), *see Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). Similarly, the rule respecting timely demand for trial by jury is a reasonable requirement calculated to insure the orderly presentation of the business of the court. *See City of Pocatello v. Anderton,* 106 Idaho 370, 679 P.2d 647, 650 (1984).

5. *Cf. United States v. Swinehart,* 614 F.2d 853, 858 (3d Cir.1980):

Because of the unique nature of a plea bargain, involving as it does the waiver of constitutional rights, we believe the parol evidence rule should not be rigidly applied to bar evidence which would aid the trial court in properly * construing the plea agreement.

Thus, evidence of a prior draft plea agreement, or of statements made by the prosecution during the plea bargaining which sheds light on the meaning of a pertinent word or phrase in an "integrated" plea agreement would be admissible.

6. Significantly, in exercising their discretion under rule 39(b) to grant a request for jury trial although untimely, courts do not exclude consideration of the circumstances surrounding the party's failure to make a timely demand. It is not that they will not *hear* a claim that failure to make a timely demand was inadvertent. Rather, they have decided that inadvertence, *without more,* is insufficient to invoke the court's discretion. K.M.C. is not claiming that it did not intend to waive jury trial but inadvertently failed to object to the waiver provision in the contract before signing it; it claims that it objected strenuously and was assured that the provision would only apply in narrow circumstances.

■ While the Magistrate was of the opinion that there was a very heavy burden on Irving to prove that K.M.C. knowingly, voluntarily and intentionally agreed to the jury waiver provision, Irving in effect contends that the burden should have been placed on K.M.C. to prove that its waiver was *not* knowing and voluntary. It argues that even if the Butler affidavit is admissible, this court should make an independent examination of the record bearing on the issue of waiver and that the affidavit is not entitled to any weight.

Professor Moore states:

> In determining whether to give effect to the contractual waiver against an objecting party the court should start with a presumption in favor of validity in the interest of liberty of contract. This would require the objecting party to point to some one or more matters that render the provision improper.

5 Moore's Federal Practice ¶ 38.46, at 38–400 (2d ed. 1984). We agree that in the context of an express contractual waiver the objecting party should have the burden of demonstrating that its consent to the provisions was not knowing and voluntary. We do not agree with Irving, however, that the uncontested Butler affidavit was insufficient to satisfy that burden.[7] The fact that Butler could not specifically identify who made the statement to him is of no consequence. He identified the two Irving representatives present when the alleged statement was made, and Irving could have produced counter-affidavits from those individuals that no such statement was made, but it did not. Its lame explanation that it could not offer such affidavits because it would then itself be violating the parol evidence rule is unworthy of reply.

■ Moreover, we do not necessarily agree with Irving that we must independently evaluate the record bearing on the issue of waiver. In *Sambo's Restaurants*, this court did state that "whenever 'constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record.'" 663 F.2d at 690 (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 n. 4, 86 S.Ct. 1245, 1247 n. 4, 16 L.Ed.2d 314 (1966)). First, in *Sambo's Restaurants*, the lower court had held that there *had* been a waiver of first amendment rights. We are not certain that a finding of no waiver warrants the same level of scrutiny.[8] Second, while the question of whether the representation allegedly made in this case modifies the contractual waiver, is in effect a mixed question of law and fact subject to our independent review, whether or not the representation was made is purely a finding of historical fact, which is not.[9] Given that we have already held that K.M.C.'s waiver would not be valid if such a representation were made, and that the claim that it was in fact made is uncontested, there is nothing further for us to review. The Magistrate did not err in denying Irving's motion to strike K.M.C.'s timely demand for a jury trial.

### III. Liability

Irving contends that the Magistrate erred in instructing the jury with respect to its obligations under the financing agreement, that K.M.C. failed to sustain its burden of showing that Irving acted in bad faith and that the jury's verdict was against the weight of the evidence. We conclude that the jury instructions were

7. Butler in his deposition testified to substantially the same facts as set forth in his affidavit.

8. In this context, we note that, while we do not dispute that "[e]rror as to the properly claimed method of trial is substantial," 5 Moore's Federal Practice ¶ 38.43, at 38–384 (2d ed. 1984), there is no right to trial by court concomitant to the constitutional right to trial by jury. *Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp.*, 294 F.2d 486, 490 (5th Cir.1961).

9. The Magistrate's specific finding, that Irving did not *deny* that the representations were made, is the equivalent on review of a factual finding by the Magistrate that they were, in fact, made, and subject to the clearly erroneous standard. Nevertheless, we observe that the only possible inference that can be drawn from Irving's repeated failure to deny the truth of Butler's affidavit is that the representations alleged were in fact made.

not in error and that the jury's verdict was supported by substantial evidence.

### A. Instructions

■ The essence of the Magistrate's instruction to the jury was that there is implied in every contract an obligation of good faith; that this obligation may have imposed on Irving a duty to give notice to K.M.C. before refusing to advance funds under the agreement up to the $3.5 million limit; and that such notice would be required if necessary to the proper execution of the contract, unless Irving's decision to refuse to advance funds without prior notice was made in good faith and in the reasonable exercise of its discretion. Irving contends that the instruction with respect to notice gave undue emphasis to K.M.C.'s theory of the case and was an erroneous explanation of its contractual obligations, in that the decision whether to advance funds under the financing agreement was solely within the bank's prerogative. It reasons further that an implied requirement that the bank provide a period of notice before discontinuing financing up to the maximum credit limit would be inconsistent with the provision in the agreement that all monies loaned are repayable on demand.

As part of the procedure established for the operation of the financing agreement, the parties agreed in a supplementary letter that all receipts of K.M.C. would be deposited into a "blocked account" to which Irving would have sole access. Consequently, unless K.M.C. obtained alternative financing, a refusal by Irving to advance funds would leave K.M.C. without operating capital until it had payed down its loan. The record clearly established that a medium-sized company in the wholesale grocery business, such as K.M.C., could not operate without outside financing. Thus, the literal interpretation of the financing agreement urged upon us by Irving, as supplemented by the "blocked account" mechanism, would leave K.M.C.'s continued existence entirely at the whim or mercy of Irving, absent an obligation of good faith performance. Logically, at such time as Irving might wish to curtail financing K.M.C., as was its right under the agreement, this obligation to act in good faith would require a period of notice to K.M.C. to allow it a reasonable opportunity to seek alternate financing, absent valid business reasons precluding Irving from doing so. Hence, we find that the Magistrate's instructions were an accurate statement of the applicable law. *See Wells v. Alexandre*, 130 N.Y. 642, 29 N.E. 142, 143 (1891) ("[I]f a notice was requisite to its proper execution, a covenant to give such notice will be inferred, for any other construction would make the contract unreasonable, and place one of the parties entirely at the mercy of the other." (citations omitted)); *cf.* U.C.C. § 2–309 comment 8 ("[T]he application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement.").

Irving cites *Grandin Industries, Inc. v. Florida National Bank*, 267 So.2d 26 (Dist.Ct.App.Fla.1972), and *Midlantic National Bank v. Commonwealth General, Ltd.*, 386 So.2d 31 (Dist.Ct.App.Fla.1980), for the proposition that it had no legal obligation to advance funds under the financing agreement. These cases are distinguishable on a number of grounds. First, in neither case did the Florida court consider the possibility of a good faith limitation on the bank's discretion. Nor is it clear that the exercise of absolute discretion under the agreements in question conferred on the banks the same power over the continued existence of the debtors as in the instant case. Second, in neither case had there been a consistent and uninterrupted course of dealing between the parties over an extended period of time as in the instant case. It does not appear that the agreement in *Grandin* established any specific line of credit or eligibility formula, or that the ongoing financing of a high volume, capital intensive business was contemplated. *Midlantic* involved a line of credit secured by personal certificates of deposit, for which there was no written

agreement and which was merely supplementary to numerous loans already outstanding from the bank to the debtor. Finally, we note that the Irving-K.M.C. agreement is governed by New York law. To the extent that our decision may be inconsistent with *Grandin* and *Midlantic,* we find them not to be controlling.

■■■ Nor are we persuaded by Irving's reasoning with respect to the effect of the demand provision in the agreement. We agree with the Magistrate that just as Irving's discretion whether or not to advance funds is limited by an obligation of good faith performance, so too would be its power to demand repayment. The demand provision is a kind of acceleration clause, upon which the Uniform Commercial Code and the courts have imposed limitations of reasonableness and fairness. *See* U.C.C. § 1–208; *Brown v. AVEMCO Investment Corp.,* 603 F.2d 1367, 1375–80 (9th Cir. 1979). The Magistrate did not err in refusing the requested charge on the demand provision.

■■■ Irving did not object to the good faith portion of the Magistrate's instruction. Nevertheless, on appeal it suggests for the first time that before liability can be imposed, the proof must establish not only abuse of discretion but also bad faith, which it defines as synonymous with dishonesty. Even if such an argument were timely at this stage in the proceedings, which it is not,[10] none of the cases cited by Irving are on point. In *Awrey v. Progressive Casualty Insurance Co.,* 728 F.2d 352 (6th Cir.1984), and *Gordon v. Nationwide Mutual Insurance Co.,* 30 N.Y.2d 427, 334 N.Y.S.2d 601, 285 N.E.2d 849 (1972), the courts held that a showing of actual bad faith would be necessary in the limited situation in which an insured sought to impose liability on an insurer in excess of policy limits. In fact, in *Gordon* the court specifically restates the familiar principle that "[i]n every contract 'there exists an implied covenant of good faith and fair dealing' (*Kirke La Shelle Co. v. Arm-*

*strong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167)." 30 N.Y.2d at 437, 334 N.Y.S.2d at 608, 285 N.E.2d at 856. Irving also relies upon *Winner Corp. v. H.A. Caesar & Co.,* 511 F.2d 1010 (6th Cir.1975), a bankruptcy appeal involving an agreement under which Caesar purchased Winner's accounts receivable and was allowed to retain a reserve to protect itself against claims, returns and allowances. Although *Winner* bears a closer resemblance to the instant case than *Awrey* and *Gordon,* we do not understand the court's opinion, that the reserve could not be invaded by Winner unless there was present bad faith as well as an abuse of discretion, to have been intended as a general statement of law. We conclude that the abuse of discretion standard under which the issue of liability was decided in the trial below was the correct one to apply in this instance.

### B. Sufficiency of the Evidence

■■■ In diversity cases we look to the law of the state whose substantive law governs the action in determining whether there is sufficient evidence to support the jury's verdict. *Arms v. State Farm Fire & Casualty Co.,* 731 F.2d 1245, 1248–49 & n. 2 (6th Cir.1984); *Gold v. National Savings Bank of the City of Albany,* 641 F.2d 430, 434 & n. 3 (6th Cir.), *cert. denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981). Under New York law, we may not set aside the jury's verdict unless the evidence so preponderates in favor of Irving that it is clear that the jury did not reach its conclusion on a fair interpretation of the evidence, or a contrary conclusion is the only reasonable one inferable from the proven facts. *Billiar v. Minnesota Mining & Manufacturing Co.,* 623 F.2d 240, 247–48 (2d Cir.1980).

Irving contends that the sole factor determinative of whether it acted in good faith is whether it, through its loan officer Sarokin, *believed* that there existed valid reasons for not advancing funds to K.M.C. on March 1, 1982. It quotes *Blaine v. G.M.A.C.,* 82 Misc.2d 653, 655, 370 N.Y.

---

10. Fed.R.Civ.P. 51.

S.2d 323, 327 (1975), for the proposition that under applicable New York law, it is the bank's "actual mental state" that is decisive. The Magistrate observed that there was competent evidence that a personality conflict had developed between Sarokin and Butler of K.M.C. He suggested that the jury may have concluded that Sarokin abused his discretion in refusing without notice to advance funds despite knowing that he was fully secured because of his disapproval of Butler's management philosophy.

■ Were the outcome of this case solely dependent upon Sarokin's *subjective* state of mind, we might feel constrained, despite the conclusions of the Magistrate above, to hold that the evidence was insufficient to support the verdict.[11] However, to a certain extent the conduct of Irving must be measured by objective standards. While it is not necessary that Sarokin have been correct in his understanding of the facts and circumstances pertinent to his decision not to advance funds for this court to find that he made a valid business judgment in doing so, there must at least be *some* objective basis upon which a reasonable loan officer in the exercise of his discretion would have acted in that manner.[12] The court in *Blaine* did state that

[t]he test as to the *good faith* of the creditor in accelerating under an insecurity clause is a matter of the creditor's actual mental state and this is not negatived by showing there was no basis for the creditor's belief, *Sheppard Federal Credit Union v. Palmer* [408 F.2d 1369 (5th Cir.1969)], supra, and it is immaterial whether the information upon which the creditor based his determination was in fact not true or the creditor was negligent in not examining to determine whether it

was true. *VanHorn v. Van de Wol, Inc.,* 6 Wash.App.2d 959, 497 P.2d 252 (1972).

370 N.Y.S.2d at 327 (emphasis added). However, this definition followed the court's statement that "[t]he criterion for permissible acceleration ... has the *dual* elements of (1) *whether a reasonable man would have accelerated the debt under the circumstances,* and (2) whether the creditor acted in good faith." *Id.* (emphasis added) (citation omitted). There is ample evidence in the record to support a jury finding that no reasonable loan officer in the same situation would have refused to advance funds to K.M.C. without notice as Sarokin did on March 1, 1982.

James Kuharski was executive vice president and manager of secured lending activities for Irving, and two levels above Sarokin in Irving's management hierarchy. Kuharski acknowledged that Irving owed its clients a duty of good faith, that it was not a policy of Irving to terminate financing without notice, and that if Sarokin believed that Irving was adequately secured he would not have been acting in accordance with that duty of good faith to have refused without notice to advance funds to K.M.C.

William Calloway was president of the Park National Bank in Knoxville, which was the depository bank for K.M.C.'s "blocked account" and a 20% participant with Irving in the financing agreement. He also acknowledged that he believed that there is a duty of good faith from a banker to his client that would require a period of notice prior to termination of financing if a loan was well secured. He testified further that on March 1, he believed that the loan to K.M.C. was fully secured as to both interest and principal, and *that any rea-*

11. We do not understand the Magistrate to have relied upon this point alone. Rather, as we read his opinion, the alleged personality conflict between Butler and Sarokin was cited as just one of several relevant factors that may have persuaded the jury.

12. While the appellee suggests in its brief that the Magistrate charged the jury on a wholly

subjective standard, we do not read the charge that way. The jury was charged "that what is important *in connection with the requirement of good faith* is the actual mental state of the officers and agents of Irving Trust." The definition of an arbitrary and capricious decision that followed, as one "having no rational basis," is consonant with our analysis.

*sonable banker looking at the loan would agree that it was fully secured.*

Gerald Connolly was an attorney in Milwaukee, Wisconsin, one of whose clients was a large wholesaler named Gateway Foods. In response to a call from Butler on March 1, Gateway's president requested that Connolly assist K.M.C. in any way he could. Connolly testified that pursuant to that request he called Sarokin, who acknowledged in their conversation that Irving was adequately secured and that terminating financing would destroy K.M.C., and that Sarokin ultimately agreed to advance the funds requested by K.M.C., in part to give Connolly the opportunity to come to Knoxville and evaluate K.M.C. for the purpose of acquisition by Gateway Foods. Connolly testified that he called Irving the next day enroute to Knoxville and was told by a subordinate that Sarokin had changed his mind about advancing funds, and that in a telephone conversation that night Sarokin stated that he had changed his mind and decided to "proceed with his game plan."

In fact, counsel for Irving conceded in his summation to the jury that the bank was adequately secured on March 1, 1982. He argued, however, that what is important is not the amount of security, but the capacity of the debtor to pay back the loan. The jury was entitled to find that a reasonable notice period would not change the ability of K.M.C. to pay the loan. The nature of the security was such that the loan would rapidly be payed down on demand. Irving's quarterly audits and other memoranda regarding K.M.C. consistently stated that the strength of its position was in the inventory, which was readily marketable. As late as two months before the events in question, the quarterly audit had concluded that even in the event of a liquidation of the company no loss would be sustained by Irving.

Generally, there was ample evidence in the record from which the jury could have concluded that March 1 simply was not that unusual a day in the history of the relationship between Irving and K.M.C. Such factors as payables and receivables, cited by Sarokin as the basis for his conclusion that K.M.C. was in a state of financial collapse, were closely monitored by Irving. Moreover, three days later, on March 4, Sarokin agreed to advance $700,000 to K.M.C., increasing its outstanding balance to $3.3 million. While the evidence was in conflict whether K.M.C.'s overall financial condition was deteriorating or improving, there is ample evidence belying Irving's characterization that on March 1, Sarokin was faced with a sudden crisis of unprecedented proportions. On this basis alone, the jury could have found that Irving did not fulfill its obligation of good faith performance to K.M.C. when it cut off financing without prior notice.

Irving also argues that it was entitled to a directed verdict on the ground that Sarokin reasonably believed that even if he advanced the $800,000 requested on March 1, K.M.C.'s checks to its suppliers would bounce in significant number and amount and K.M.C. would fold anyway. The events of March 1 were triggered by K.M.C.'s request the previous Friday for an extension of its line of credit to $4 million. Sarokin testified that he believed that K.M.C. would have required this extension, in addition to its request for $800,000 up to its $3.5 million line, to cover all of its outstanding checks. The evidence was substantially in conflict on whether with the $800,000 all of K.M.C.'s checks would have been honored when presented. The jury, by its verdict, resolved this fact issue in favor of K.M.C. In awarding damages to K.M.C. it found that Irving's breach caused K.M.C.'s injury. Irving does not object that the jury was improperly charged on causation. It necessarily follows from the jury's award of damages to the plaintiff that it found that checks would not have bounced. There was ample evidence in the record from which the jury could have so found. However, the question of whether checks in fact would have bounced is distinct from the question of whether Sarokin reasonably could have believed that they would bounce. On the record before us we do not think that the

jury could find that Sarokin could not reasonably have held such a belief. Therefore, the question that we must address is whether such a belief in itself would constitute a valid business reason for Irving to refuse to advance the funds requested by K.M.C. without prior notice. We hold, on the particular facts before us, that it would not.

Whether or not the $800,000 requested would have been sufficient to cover all of K.M.C.'s outstanding checks, Sarokin's abrupt refusal to advance funds to K.M.C. on March 1 amounted to a unilateral decision on his part to wind up the company. If Sarokin had agreed to advance the $800,000 but no more, and checks still had bounced, we would have a different case. But, given that Sarokin knew or should have known that the bank was adequately secured, and that if adequately secured it was Irving's policy that some period of notice would be due before financing was denied, Sarokin's action could only be justified if in some way he reasonably believed that it was necessary to protect the bank's interests. There was ample evidence—in particular, the conclusion of Irving's auditors that no losses would be sustained by the bank in the event of liquidation, and Sarokin's decision on March 4 to advance almost the full amount requested just three days earlier, despite the fact the K.M.C. was in much worse condition because of the intervening damage to its credit standing—from which the jury could have concluded that Sarokin had no such reason in mind and hence that his action was arbitrary and capricious.

■ Finally, Irving contends that even if a period of notice were required, it would be unreasonable to impose upon it an obligation to continue financing K.M.C. for the length of time that would have been necessary to arrange alternative financing or a sale of the company. If Irving had given K.M.C. 30 days, 7 days, even 48 hours

notice, we would be facing a different case.[13] However, no notice was given. Until Sarokin told Butler on the phone the afternoon of March 1 that the $800,000 requested would not be advanced, not even Calloway of the Park Bank or Lipson, who had been sent down to Knoxville by Sarokin the previous Friday to gather information, both of whom lunched with Butler immediately before the call to New York, had any inkling that Sarokin might act as he did. Based upon the reasoning above, whether alternative financing could have been found or a sale arranged is pertinent to causation rather than whether Sarokin acted reasonably and in good faith, and there was ample evidence in the record from which the jury could find that either would have been possible.

## IV. Damages

Irving contends that the Magistrate erred in admitting incompetent and nonprobative expert evidence pertaining to K.M.C.'s going concern value. In particular, it objects to the testimony of witnesses Ronnenberg and Wampler.

### A. Ronnenberg's Testimony

■ Robert Ronnenberg, a financial consultant with the NPM Group, a consulting firm to financially troubled companies, spent several months living in Knoxville and working with K.M.C. in an effort to salvage the company after the events of March 1, 1982. His specific qualifications as an expert included having worked in the food business since 1971, in particular in the area of evaluation of businesses for acquisition. As part of his testimony, he presented a valuation of K.M.C. He determined that the going concern value of K.M.C. as of March 1, 1982, was $10,351,200, the average of five different methods of valuation the results of which ranged from $4,183,600 to $14,381,600. Irving contends that each individual valuation was

---

**13.** If during that period a tentative commitment was made with respect to a sale or alternative financing, since either of those once completed would result in the immediate repayment of Irving's loan, it might well be that it would be

arbitrary and capricious for Irving to terminate financing at the expiration of the notice period if that period was insufficient to permit completion of the contemplated transaction.

based on groundless assumptions and that in combination they produced a grossly distorted value for the business as a going concern.

In reviewing assertions of error pertaining to the admission of expert evidence, we start with the principle that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (citation omitted); *see Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 634 (6th Cir.1978); *Bridger v. Union Railway Co.*, 355 F.2d 382, 387 (6th Cir.1966). While we do not dispute Irving's contention that valuations cannot be based on expert testimony that is purely speculative, "[t]here is no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counter-attack, from evidence that is not." *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 912 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). The Magistrate was of the opinion that Ronnenberg's analysis had "some logical bases," and that Irving's objections went to weight and not admissibility. We cannot say that his conclusions were clearly erroneous.

The jury was properly charged that damages should be based on the difference between the value of K.M.C. as a going concern immediately before March 1, 1982, and its value after that date, and that those values were to be determined with reference to what a willing buyer would pay and willing seller accept for the company. There was no substantial disagreement in the proofs that the specific market for mid-sized wholesalers such as K.M.C. was composed of larger wholesalers, and that such wholesalers enjoyed certain financial advantages, such as greater buying power and lower financing costs, which enabled them to operate such companies more profitably. There was significant disagreement, however, whether the price that a larger company would be willing to pay for a smaller one would be measured by the value of the smaller company to the buyer or the seller. The evidence was undisputed that the industry was in an "acquisition mode" during the relevant time period, and that a number of larger companies had expressed interest in acquiring K.M.C. The jury was entitled to find as a matter of common sense that in a competitive sellers market, price would gravitate toward what the value of the acquired company would be to the acquirer. Certainly there was substantial evidence from which the jury could reach such a conclusion.

Ronnenberg's valuation was based, not on what K.M.C. would have done had it remained a privately owned mid-sized wholesaler, but on its projected performance following acquisition by a larger company. Upon this premise he built into his various projections certain assumptions with respect to the advantages enjoyed by larger over mid-sized companies. Irving contends that it is impermissible to disregard past operating history in projecting future profits.[14] However, since the jury reasonably could have concluded that K.M.C. would be valued by larger companies based on such projections, we do not consider Ronnenberg's approach to be unacceptable. *Cf. Lehrman v. Gulf Oil*

---

**14.** In *Fehrs v. United States,* 223 Ct.Cl. 488, 620 F.2d 255 (1980), the court rejected a valuation based upon prospective earnings premised on improved performance following a change in management. Contrary to Irving's reading of this case, however, the court does not hold that such an approach is inherently improper. Rather, it states that "prospective earnings are important," but that "a valuation that completely disregards the recognized importance of actual earnings as a factor in the assessment of future expectations ... must rest on something more than ... naked speculation...." 620 F.2d at 265. In *Fehrs,* the court concluded that there was "nothing that would lend even remote support to the premise that Rental's profit doldrums were of its own making (and implicit in the analysis—instantly correctable) save only the expert's supposition to such effect." *Id.* In the instant case, however, there is substantial evidence to support Ronnenberg's assumptions regarding the advantages enjoyed by large over mid-sized wholesalers.

*Corp.*, 500 F.2d 659, 668 (5th Cir.1974) ("Reliance upon past volumes, margins and expenses in order to forecast future profits without emphasis on past profits is not the usual before and after method either. Just because Lehrman's method of proof is specially tailored to fit his case, however, does not render it unacceptable.").

Certainly there were weaknesses in Ronnenberg's valuation method, such as long-term projection based on profits annualized from K.M.C.'s operation over just a three month period, and undifferentiated averaging of the widely varying results of five different valuation formulas to arrive at a definitive amount. Nevertheless, his various figures and assumptions were not purely speculative, but were derived from financial data and competent testimony in the record and based on his personal experience and knowledge. *Cf. Marquis v. Chrysler Corp.*, 577 F.2d 624, 638–39 (9th Cir.1978) ("Iles' assumptions and estimates were not demonstrably false or unreasonable. Certainly some facets of his testimony were weak, but his opinion as a whole was well grounded in his investigation, inquiries, knowledge and non-frivolous assumptions. This method of computation was sufficient to present a jury question."); *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 564–67 (2d Cir.1970). Ronnenberg was cross-examined at length, Irving introduced rebuttal evidence from its own experts, *see Fuentes v. Reilly*, 590 F.2d 509, 511 (3d Cir.1979), and Irving's arguments on the proper method of valuing K.M.C. were repeatedly emphasized to the jury, and went to the weight, not the admissibility, of the evidence. *Autowest*, 434 F.2d at 567.[15]

**B. Wampler's Testimony**

■ G.V. Wampler testified on the comparability of K.M.C. to the Hudson-Thompson Company, another mid-sized wholesaler that was acquired by the larger Flickinger Company on March 1, 1982, for $10 million. Although Irving contends that the two companies are not comparable, it did not object to this testimony as nonprobative. Rather, it objected that K.M.C.'s intention to proffer this testimony was deliberately withheld until the trial was in progress, and that it was unfairly surprised and prejudiced thereby. K.M.C. contended that Wampler's testimony was based on a document pertaining to the Hudson-Thompson acquisition on file with the S.E.C., which K.M.C. did not discover until after the taking of Wampler's deposition. Irving's argument was that K.M.C. had an obligation under Fed.R.Civ.P. 26(e)(2) to amend and supplement prior discovery responses given at a deposition. After extended argument out of the hearing of the jury, the Magistrate allowed the testimony over objection, stating that it was not clear that a specific question was asked when Wampler's deposition was taken that would have elicited the information upon which the comparison testimony was based, and that there was no evidence of a deliberate effort to conceal information.

Initially, we observe that exclusion of evidence is a drastic sanction. *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3d Cir.1978). This Court has held, in circumstances somewhat analogous to those here at issue, that

---

**15.** None of the various cases cited by Irving in which expert testimony was excluded persuade us that it was "manifestly erroneous" to admit Ronnenberg's valuation testimony. In particular, Irving relies upon *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir.1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), and *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383 (6th Cir.1962), *cert. denied*, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963).

In *Seagrams*, the challenged expert, unlike Ronnenberg, although a C.P.A. was not an expert in the valuation of businesses, and had not examined the plaintiff's books and records. 416 F.2d at 85. Moreover, the court found that certain key assumptions made by the expert were as a factual matter "patently false," 416 F.2d at 86–87, which cannot be said of Ronnenberg's valuation.

In *Volasco*, the court rejected as "speculative, remote and uncertain" an expert's testimony that the plaintiff's sales potential was equal to that of another company. 308 F.2d at 392. In *Volasco*, however, there was no evidence to establish that the companies were comparable, and there was no foundation for the assumptions made in projecting future sales.

[t]he Rule 26(e)(2) duty to amend and supplement may well have allowed the trial court to sanction Sawyer.... Here, however, we are asked to grant a new trial based on the lack of supplementation. In light of the immense discretion given to trial courts on discovery matters, Lewis is required to show significant prejudice caused by the lack of supplementation.

*Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co.,* 709 F.2d 427, 433–34 (6th Cir.1983) (citations omitted). This distinction was recognized by the Magistrate, and we cannot say that his conclusion that Irving suffered no undue prejudice was clearly erroneous.

Irving's contention is that it had no opportunity to deal adequately with Wampler's surprise testimony. However, five days later Irving's expert witness Postl offered testimony comparing K.M.C. to Hudson-Thompson, as well as five other wholesale grocery companies, which impresses us as extremely thorough in both preparation and presentation. In fact, because Irving had sought to add Postl as an expert witness after entry of the pretrial order, the Magistrate had originally limited him to fact testimony only. The day before he testified, however, counsel for Irving requested that Postl be allowed wider latitude in his testimony in order to rebut Wampler. The Magistrate responded favorably, observing that it was obvious that to some extent Irving was surprised by Wampler's testimony and that it was only fair that Irving have the opportunity to rebut it.[16] Irving also could have requested a continuance if it needed additional time to prepare a response to Wampler's testimony, but it did not do so. *See Lewis Refrigeration,* 709 F.2d at 433; *In re McBee,* 714 F.2d 1316, 1320 (5th Cir.1983); *Berroyer v. Hertz,* 672 F.2d 334, 338–39 & n. 6 (3d Cir.1982) ("[T]he defendant made no attempt to cure the alleged surprise or prejudice by seeking a summary of anticipated testimony, by requesting to depose the witness that evening, or by seeking a continuance.").

## C. Excessive Verdict

 We are not insensitive to Irving's complaint that K.M.C.'s value on March 1, 1982, was less than the jury's award of $7,500,000. It is plain from the record that the company was heavily leveraged, its heavy losses in 1981 had eroded stockholder equity, and it had a substantial amount of uncollectible receivables in excess of its bad debt reserve. Nevertheless, the Magistrate concluded that the damage award was not outside the limits of the reasonable range, and we are constrained to agree. *Hoskins v. Blalock,* 384 F.2d 169 (6th Cir. 1967). Plaintiff's witness Ronnenberg valued K.M.C. at $10,351,200, and Wampler at $11 to 13 million. It is noteworthy that Irving's witness Randal Smith, executive vice president for Scrivener, Incorporated, a large food wholesaler, testified that on November 21, 1979, he offered $3.5 million for K.M.C.'s stock. Scrivener's internal analysis of this offer estimated that with the assumption of K.M.C.'s net liabilities the total cost of acquisition would be $8.9 million. Moreover, Smith almost immediately raised Scrivener's offer to $4.5 million, and was authorized to go to $5.0 million. This $4.5 million offer would have amounted to a total price of $9.9 million.

The judgment is affirmed.

---

**16.** While we do not hold that Irving waived its objection to Wampler's testimony, we do not think it irrelevant to the question of whether Irving suffered *prejudice* that in the course of its argument to the Magistrate requesting greater leeway for Postl, Irving's counsel stated about Wampler's testimony that *"I'm glad it is in now."*