CHECK REPORTING SERVICES, INC v MICHIGAN NATIONAL
BANK-LANSING

Docket No. 115949. Submitted October 3, 1990, at Lansing. Decided
July 30, 1991; approved for publication October 22, 1991, at
9:10 A.M. Leave to appeal sought.

Check Reporting Services, Inc., brought an action in the Ingham
Circuit Court against Michigan National Bank-Lansing and
Michigan National Corporation, seeking damages allegedly suf-
fered when the defendants accelerated the maturity of a loan
made to the plaintiff, exercised a right of setoff against sums
held in one of the plaintiff's accounts, and refused to honor
drafts drawn on another account. The court, Peter D. Houk, J.,
granted the defendants' motion for summary disposition. The
plaintiff appealed the grant of summary disposition, and the
defendants cross appealed.

The Court of Appeals *held:*

The trial court did not err in granting summary disposition
with respect to each of the plaintiff's seven counts and dismiss-
ing the action, but did err in denying costs to the defendants
without stating the reasons for the denial.

1. The defendant bank was under no obligation of good faith
when it chose to exercise its right to accelerate the maturity of
the promissory note and demand payment, because the Uni-
form Commercial Code obligation of good faith does not apply
to demand instruments.

2. The trial court properly held that the plaintiff failed to
plead evidence in support of its bare allegation of fraudulent
misrepresentations by the bank.

3. The trial court properly found that the pleaded facts
established that on the date of the bank's dishonor of the drafts
there were not sufficient funds in the account to cover the
drafts being held and that the draft account and loan agree-
ments granted the bank the right to return all drafts for which
there were insufficient funds. Accordingly, the court's finding of
no wrongful dishonor was proper.

4. Because the bank had discretion to decide whether to

REFERENCES

Am Jur 2d, Bills and Notes §§ 167, 426, 427; Commercial Code § 63.
See the Index to Annotations under Bills and Notes.

dishonor the drafts because of the overdraft situation, the bank's decision not to dishonor the drafts immediately, but rather to hold them a few days to permit the plaintiff to cover the overdraft, did not constitute a failure of the bank to act seasonably.

5. The bank had a common-law right to a setoff upon a showing that the funds that were set off were the plaintiff's, and were in a general unrestricted account, the debt was due and owing, and there was mutuality of obligation. The record demonstrates that these conditions existed. Accordingly, the bank's exercise of its right of setoff was not an unlawful conversion of the plaintiff's property.

6. The plaintiff's defamation claim was without factual support.

7. The plaintiff failed to cite any authority supporting its contention that the trial court erred in dismissing its claim of interference with business relationships and with prospective advantage. The claim therefore is considered abandoned.

8. The failure of the trial court to state in writing its reason for denying costs to the defendants requires a remand for further proceedings relative to that question.

Affirmed, but remanded for proceedings relative to costs.

BILLS, NOTES, AND CHECKS — DEMAND INSTRUMENTS — GOOD FAITH.
The obligation of good faith imposed by the Uniform Commercial Code on the performance and enforcement of every contract or duty within the code does not apply to demand instruments (MCL 440.1203; MSA 19.1203).

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Jeremiah J. Kenney* and *Pamela Hobbs*), for the plaintiff.

*Willingham & Coté, P.C.* (by *John L. Coté*), for Michigan National Bank-Lansing.

*Plunkett & Cooney, P.C.* (by *James L. Allen*), for Michigan National Corporation.

Before: WAHLS, P.J., and DOCTOROFF and G.S. ALLEN,* JJ.

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

Per Curiam. Plaintiff appeals as of right a circuit court order granting defendants' motion for summary disposition pursuant to MCR 2.116(C)(8) and (10) and dismissing plaintiff's complaint. Plaintiff raises numerous issues in challenging the dismissal of its complaint. Defendants cross appeal the denial of their motion for costs and sanctions. We affirm.

For nearly twenty-five years, plaintiff Check Reporting Services, Inc. (CRS) provided a check reporting and guarantee service to the business community. CRS would purchase consumer checks from merchants at a discount and bear the responsibility of collection. As its business grew, CRS entered into a payable through draft agreement with defendant Michigan National Bank-Lansing (MNB). Under this arrangement, CRS' customers (merchants) would endorse their consumer checks over to CRS and mail the checks with a deposit slip to CRS for deposit in CRS' check purchase account. The merchant, using a blank draft issued by CRS, would then draw the discounted amount from CRS' draft account. Thus, the collected customer checks deposited in the check purchase account would fund the drafts drawn on the draft account.

Under the agreement, MNB was required to pay only those drafts for which there were sufficient collected funds in the check purchase account, i.e., funds representing checks that had cleared the Federal Reserve Bank. The checks mailed from CRS' customers had a longer processing time, because of the delay in mailing, than the drafts drawn by the merchants from the draft account. As a result, the check purchase account would evidence a "negative float" representing the amount of uncollected funds. This in turn could lead to an overdraft situation in the draft account.

To remedy this situation, MNB extended to CRS

an unsecured line of credit of $50,000 in June, 1984. The purpose of this loan was to fund the check purchase account. In October, 1984, the line of credit was increased to $150,000, and CRS granted MNB a security interest in CRS' accounts, inventory, equipment, and all funds that were then on deposit or in the future would be on deposit in the check purchase account. Paragraph 9 of the security agreement listed the events constituting default and the available remedies for MNB, including the right to immediate possession of the collateral.

The business loan agreement executed on February 22, 1985, increased the line of credit to $250,000 with a $50,000 "bulge line," for a total credit line of $300,000. MNB still was required to pay only those drafts for which there were sufficient collected funds on deposit in the check purchase account. MNB was granted the right to set off any or all of CRS' deposit accounts, or any other property held by it, against any indebtedness of CRS to MNB. The agreement described the events constituting default and the bank's remedies, which included a "no waiver" provision. On February 22, 1985, CRS signed a promissory note for the $300,000 line of credit loan, which stated that the loan amount was due on demand.

In 1985, CRS experienced what it describes as "a period of explosive growth" in its business. Plaintiff admits that this growth "strained [its] lines of credit to the breaking point," creating a "potential for negative float of between $1 million and $1.5 million."[1] Further, CRS admits that by October, 1985, its check purchase account "was almost continually in a negative float" and that "over-

---

[1] CRS had a similar account at Huntington National Bank in Ohio. CRS' line of credit with Huntington National Bank was increased to $400,000 in October, 1985.

drafts were beginning to occur" even with the credit line fully extended.

CRS admits that it was aware of MNB's "discomfort" with the situation, but that the bank continued to pay drafts presented daily, even when the payment created an overdraft in the check purchase account. CRS acknowledges its awareness that MNB's "discomfort" was not just over the negative float, but over CRS' inability to track its net position on a daily basis.

On October 23, 1985, CRS' management met with MNB officials regarding the bank's concern over the apparent problem with CRS' accounts. The bank demanded that CRS not sign any new customers until it found additional capitalization to remedy the intolerable overdraft situation. CRS' check purchase account was overdrawn thirteen times in both November and December, 1985, and nine times up to, and including, January 16, 1986.

Another meeting was held between MNB and CRS on January 17, 1986. During this meeting, MNB hand-delivered to William Gerlach, CRS' chief executive officer, a "requirements letter" dated January 16, 1986. Because of the continual overdraft situation, CRS' inadequate capitalization, and CRS' failure to comply with the documentation requirements under the loan agreements, the bank made the following demands:

> 1. CRS must IMMEDIATELY initiate steps to eliminate the overdraft balance in the checking account. This must be accomplished no later than January 31st and no further overdrafts will be allowed after January 31st.
> 2. CRS must generate a meaningful and accurate Deposit/Draft Reconciliation Report and furnish report to the Bank on a daily basis, starting IMMEDIATELY.
> 3. $300,000 line of credit balance must have

100% coverage of net drafts receivable, as reported on the daily Deposit/Draft Reconciliation Report, plus cash balance in account.

4. CRS to furnish to the Bank monthly Balance and Operating Statements for November 30, 1985 no later than January 24th and for December 31, 1985 no later than January 31st.

5. CRS to furnish to the Bank proforma income statements for the period January 1 through June 30, 1985 no later than January 31st.

6. CRS to furnish to the Bank a plan in writing no later than February 15th for injection of a minimum of $500,000 new capital, and implementation of the plan no later than March 15th.

After reviewing the requirements, Gerlach informed MNB that the January 31 deadline for eliminating the overdraft situation was "impossible." He also indicated that CRS would be unable to provide the deposit/draft reconciliation reports, but would attempt to gather accurate information regarding its net position.

With respect to the infusion of $500,000 of capital, CRS informed MNB of the prospective sale of its controlling shares to Paul Quinn, a millionaire real estate investor and future brother-in-law of the vice president of CRS' Ohio operations. However, the sale was never consummated, and MNB never received written confirmation, as required, of a commitment by anyone for the injection of new capital.

From February 13, 1986, to February 20, 1986, several meetings were held between MNB and CRS. During these meetings, the bank's attorney informed CRS, and CRS acknowledged, that the continuation of the loan relationship would be decided on a day-to-day basis. During the February 13 meeting, the bank learned that CRS was holding nearly $960,000 in returned and uncollected cus-

tomer checks purchased by CRS. MNB requested that CRS surrender possession of these checks. CRS initially agreed, but ultimately refused.

On Friday, February 14, 1986, MNB did not pay drafts presented that day, but held them over the holiday weekend to allow CRS to make deposits to cover its existing overdraft of $318,653. On Tuesday, February 18, 1986, MNB returned drafts totaling $18,411.70 because CRS' check purchase account was overdrawn by $5,774.51. However, $158,522.82 of the $176,934.52 in drafts received on February 14 were paid. On February 18, MNB received $174,924.67 in drafts and informed CRS that it was holding them to allow CRS to collect its deposits and raise the account balance to prevent another overdraft.

On February 19, the bank received additional drafts totaling $309,849.08. On that morning, CRS' account had a balance of $172,183.32 in uncollected funds. MNB again informed CRS that it would hold the drafts.

Additional drafts totaling $164,766.85 were received by MNB on the morning of February 20, 1986. CRS' check purchase account evidenced a balance of $352,110.46, but in uncollected funds. MNB then informed CRS that, because of CRS' inability to cure the repeated defaults, it was demanding payment of CRS' promissory demand note, accelerating the maturity of the term loan, and exercising its right of setoff against the check purchase account. The drafts presented between February 18 and 20, 1986, totaling $649,540.60 were all returned unpaid and stamped "NSF" by MNB.

On the basis of these events, CRS filed a seven-count complaint against MNB and Michigan National Corporation on September 30, 1986. CRS brought actions for "lender liability" (alleging

breach of the obligation of good faith and fraud), wrongful dishonor, negligence, conversion, defamation, interference with business relationships, and interference with prospective advantage. Following extensive discovery, defendants moved for summary disposition of all seven counts. On February 22, 1989, the trial court issued its opinion and order granting defendants' motion with regard to all counts, thus dismissing CRS' complaint in its entirety.

On appeal, CRS contends that the trial court erred in dismissing its lender liability claim by holding that the obligation of good faith does not apply to demand instruments and by finding no genuine issue of fact with respect to the fraud claim despite the fact that defendants did not controvert CRS' allegations of fraud.[2]

CRS' lender liability claim presented two issues. First, whether the obligation of good faith applied to demand instruments. Second, whether MNB's actions amounted to fraud. The trial court dismissed the first issue under MCR 2.116(C)(8) and the second issue under MCR 2.116(C)(10).

A motion brought under MCR 2.116(C)(8) tests the legal sufficiency of the claim by the pleadings alone and may be granted when a plaintiff has failed to state a claim upon which relief can be granted. *Pawlak v Redox Corp,* 182 Mich App 758, 763; 453 NW2d 304 (1990). All factual allegations in support of a claim are accepted as true, as are all inferences that can be fairly drawn from the facts. *Id.* The motion should be granted only when a claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right to recovery. *Id.*

A motion for summary disposition pursuant to

---

[2] The first three issues stated by CRS are interrelated and are addressed as one issue.

MCR 2.116(C)(10) may be granted when, except with respect to the amount of damages, there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A motion for summary disposition brought under MCR 2.116(C)(10) tests the factual support for a claim. The party opposing the motion must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial. *Ewers v Stroh Brewery Co,* 178 Mich App 371, 374; 443 NW2d 504 (1989), MCR 2.116(G)(4). The court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence available to it. *Major v Auto Club Ins Ass'n,* 185 Mich App 437, 440; 462 NW2d 771 (1990). Giving the benefit of reasonable doubt to the opponent, the court must determine whether a record might be developed that would leave open an issue upon which reasonable minds might differ. *Amorello v Monsanto Corp,* 186 Mich App 324, 330; 463 NW2d 487 (1990).

We first address CRS' claim that the obligation of good faith applies to demand instruments.

CRS relies on § 1-203 of the Uniform Commercial Code, MCL 440.1203; MSA 19.1203, which provides that an obligation of good faith is imposed on the performance and enforcement of every contract or duty within the code. As stated in the official comment to § 1-203, particular applications of the basic principle set forth in § 1-203 appear in specific provisions of the code, such as § 1-208, MCL 440.1208; MSA 19.1208, which concerns the right to accelerate at will. The official comment to § 1-208 states:

> Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason.

When interpreting uniform laws, such as the UCC, we may look to decisions from other states for guidance. *Old Kent Bank-Southeast v Detroit,* 178 Mich App 416, 423; 444 NW2d 162 (1989).

Courts in other states that have considered this issue have held that the obligation of good faith does not apply to demand instruments. *Pavco Industries, Inc v First National Bank of Mobile,* 534 So 2d 572 (Ala, 1988); *Taggart & Taggart Seed, Inc v First Tennessee Bank National Ass'n,* 684 F Supp 230 (ED Ark, 1988), aff'd 881 F2d 1080 (CA 8, 1989); *Centerre Bank of Kansas City, NA v Distributors, Inc,* 705 SW2d 42 (Mo App, 1985); *Fulton National Bank v Willis Denney Ford, Inc,* 154 Ga App 846; 269 SE2d 916 (1980). We agree with these courts that the obligation of good faith does not apply to demand instruments.

CRS' reliance on *KMC Co, Inc v Irving Trust Co,* 757 F2d 752 (CA 6, 1985), is misplaced. Because the parties are familiar with the facts and holding of *KMC,* it is unnecessary to repeat them here. However, we note several important facts that distinguish this case from *KMC.* Unlike the relationship between KMC and Irving Trust, CRS did not have a "blocked account" arrangement with MNB, but rather had not only control over the funds in the check purchase account, but also the discretion of depositing its customers' checks in the account at all. CRS thus had a source of funds other than those provided by MNB through its financing agreements. MNB, unlike Irving Trust, was not fully secured on the various loan agreements with CRS. Further, MNB provided notice of its intent to require strict compliance beginning January 16, 1986, and of its refusal to extend further credit to CRS. Additionally, MNB provided financing up to the maximum line of credit limit of $300,000, and it merely refused to provide

financing beyond the agreed limit. Irving Trust, however, had refused to provide financing up to, not beyond, the agreed financing limit. Lastly, MNB did, in fact, "call" the loan by demanding payment on the promissory note, which had not occurred in *KMC.*

Thus, although the Sixth Circuit stated that a "demand provision is a kind of acceleration clause" to which the obligation of good faith in § 1-208 applies, Irving Trust did not "call" the loan, but merely refused further financing. This statement by the Sixth Circuit is thus dictum and, because of the distinctive facts in that case, is not persuasive.

Accordingly, we find that CRS' lender liability claim based upon its allegation of breach of an obligation of good faith was properly dismissed pursuant to MCR 2.116(C)(8).

CRS also based its lender liability claim on alleged fraudulent representations by MNB. The trial court dismissed the allegations on grounds that CRS failed to present any documentary evidence supporting its claim and demonstrating the existence of a genuine issue of material fact. After reviewing the record, we find no error. Plaintiff's mere allegations, unsupported by documentary evidence, are insufficient to establish the existence of a material issue of fact. *Stanton v Dachille,* 186 Mich App 247, 262; 463 NW2d 479 (1990). Summary disposition of CRS' lender liability claim was properly granted.

CRS next argues that the trial court erred in dismissing its wrongful dishonor claim. CRS' complaint alleged that defendants' refusal to honor drafts on February 20, 1986, for which there were currently funds on deposit, constituted wrongful dishonor in violation of § 4-402 of the Uniform Commercial Code, MCL 440.4402; MSA 19.4402.

The trial court dismissed the claim pursuant to MCR 2.116(C)(10), finding that no genuine issue of material fact existed because (1) of the lack of evidence disproving CRS' default coupled with CRS' admissions, (2) payment of the $649,540 in drafts held on February 20 would have caused a substantial overdraft in CRS' check purchase account, and (3) the terms of the draft purchase agreement and the business loan agreement entitled MNB to return all drafts for which there were insufficient collected funds on deposit in the check purchase account.

Wrongful dishonor under § 4-402 excludes any permitted or justified dishonor. Official Comment to § 4-402. We note that there is some confusion regarding the exact balance, either in uncollected or collected funds, in CRS' check purchase account on February 20, 1986, when MNB exercised its right to use the funds in that account to set off the amounts outstanding on the line of credit and term loans. Nevertheless, plaintiff has failed to provide any documentary evidence that there were *any* collected funds in its check purchase account. This failure, coupled with MNB's right, pursuant to the business loan agreement, to return any drafts for which there were insufficient collected funds on deposit in CRS' check purchase account, demonstrates that the dismissal of plaintiff's wrongful dishonor claim pursuant to MCR 2.116(C)(10) was proper.

We do not address CRS' argument that MNB failed to return the drafts by its midnight deadline and, thus, is liable for wrongful dishonor under MCL 440.4302(a); MSA 19.4302(a), because this was neither the basis for its claim of wrongful dishonor in its complaint nor the reason given by the trial court for dismissal.

CRS next argues that the trial court erred in

dismissing its claim that MNB failed to exercise ordinary care in the handling of the drafts that were dishonored on February 20, 1986.

MCL 440.4202; MSA 19.4202 requires in part that a collecting bank use ordinary care in the exercise of its basic collection tasks. Under § 4-103, MCL 440.4103; MSA 19.4103, a bank may not disclaim, by agreement, its responsibility for its failure to exercise ordinary care.

CRS argues that by holding up the drafts received from February 13 through February 19, MNB did not act "seasonably" as required by § 4-202(2), MCL 440.4202(2); MSA 19.4202(2), and, thus, failed to use ordinary care. However, CRS' argument ignores the provision in the business loan agreement that granted MNB the discretion whether to pay drafts for which there were insufficient collected funds on deposit in the check purchase account. In essence, plaintiff wishes to hold MNB liable for its failure to honor timely the drafts presented to it from February 13 through February 19, ignoring the fact that MNB had the discretion to dishonor. In fact, the evidence indicates that MNB held the checks, rather than immediately dishonoring them, to provide CRS an opportunity to accumulate collected funds in its check purchase account. The trial court properly granted summary disposition of this claim.

CRS also argues that the trial court erred in dismissing its conversion claim.

An action for the conversion of bank account funds, i.e., the act of dominion wrongfully exerted over another's personal property inconsistent with the ownership rights of the other, can be maintained only if there was an obligation on the defendant's part to return or deliver the specific money entrusted to it. *Garris v Bekiares,* 315 Mich 141, 148; 23 NW2d 239 (1946); *Citizens Ins Co of*

*America v Delcamp Truck Center, Inc,* 178 Mich App 570, 575; 444 NW2d 210 (1989).

Where, as here, defendants did not waive their common-law right of setoff, MNB had the right to use the funds on deposit in CRS' check purchase account as a setoff against CRS' obligations. *White Truck Sales of Saginaw, Inc v Citizens Commercial & Savings Bank,* 348 Mich 110, 117; 82 NW2d 518 (1957); *Hansman v Imlay City State Bank,* 121 Mich App 424, 429; 328 NW2d 653 (1982). However, in order for MNB to establish its right to set off CRS' check purchase account funds against CRS' indebtedness to it, MNB must show that (1) the funds used for the setoff were the property of CRS, (2) the funds were in a general account without restriction regarding their use, (3) the debt was due and owing at the time of setoff, and (4) there was a mutuality of obligation between CRS and MNB, as well as between the debt and the funds on deposit in the check purchase account. *Hansman,* p 430.

The record demonstrates that these four conditions existed. CRS failed to present evidence demonstrating the existence of a material question of fact regarding MNB's right to set off CRS' check purchase account funds against CRS' debt to MNB. MNB's exercise of dominion over the account funds was not wrongful, therefore CRS' conversion claim was properly dismissed pursuant to MCR 2.116(C)(10).

CRS further contends that the trial court erred in dismissing its defamation claim.

CRS' claim of defamation is based on its contention that there were collected funds on deposit in its check purchase account. However, as discussed previously, CRS has failed to present any evidence to support that contention. Rather, the evidence indicates that the balance in the check purchase

account represented the amount of uncollected funds. Because MNB had a right under the various agreements not to honor drafts for which there were insufficient collected funds on deposit in CRS' check purchase account, MNB was entitled to return the drafts stamped "NSF". Summary disposition pursuant to MCR 2.116(C)(10), therefore, was properly granted.

CRS' final argument is that the trial court erred in dismissing its claim of interference with business relations and interference with prospective advantage.

Determining that CRS' claims were predicated upon the issue of the collected balance in the check purchase account and the claimed wrongful dishonor or improper seizure of the funds on deposit, the trial court dismissed CRS' claims pursuant to MCR 2.116(C)(10) on the basis of its analysis of the previous issues. CRS does not cite any authority to support its claim that the trial court erred and, thus, has failed to properly present this issue for review. To properly present an appeal, an appellant must approximately argue the issues identified in its statement of the questions involved. *Midland v Helger Construction Co, Inc,* 157 Mich App 736, 745; 403 NW2d 218 (1987). An appellant may not merely announce its position and leave it to this Court to discover and rationalize the basis for its claims. *Mitcham v Detroit,* 355 Mich 182, 203; 94 NW2d 388 (1959); *Sargent v Browning-Ferris Industries,* 167 Mich App 29, 32-33; 421 NW2d 563 (1988). Arguments without supporting citation are considered abandoned on appeal. *General Motors Corp v Public Service Comm No 2,* 175 Mich App 584, 590; 438 NW2d 616 (1988). In addition, we decline to address the new issues raised in plaintiff's reply brief because they are not properly before us. MCR 7.212(F).

Defendants, on cross appeal, argue that the trial court erred when it denied costs without stating reasons in its February 23, 1989, opinion and order dismissing CRS' complaint. MCR 2.625(A)(1) provides: "Costs will be allowed to the prevailing party in an action, unless prohibited by statute or by these rules or unless the court directs otherwise, for reasons stated in writing and filed in the action." The trial court did not comply with this rule in denying costs. Accordingly, we remand to the trial court for further proceedings, during which the trial court shall state in writing its reasons for denying costs or entertain defendants' renewed motion for costs.

Affirmed with respect to the grant of summary disposition, but remanded for further proceedings consistent with this opinion regarding the issue of costs. We do not retain jurisdiction.