**TRAVEL SERVICES NETWORK,INC.,**
**Plaintiff,**

**v.**

**PRESIDENTIAL FINANCIAL CORP. OF MASSACHUSETTS, Defendant.**

**Civ. No. 3:94cv654 (JBA).**

United States District Court,
D. Connecticut.

March 19, 1997.

Francis A. Miniter, Miniter & Associates, Hartford, CT, for plaintiff.

James J. Tancredi, Lorenzo Mendizabal, Kent Ian Scott–Smith, Day, Berry & Howard, Hartford, CT, for defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 27)

ARTERTON, District Judge.

This action arises from a secured lending agreement between plaintiff Travel Services Network, Inc. ("TSN") and defendant Presidential Financial Corporation of Massachusetts ("Presidential") TSN contends that Presidential, its creditor, is liable under various theories for nondisclosure, misrepresentation, and failure to fulfill contractual obligations. Presidential moves for summary judgment as to all of TSN's claims. For the reasons set forth below, Presidential's motion is GRANTED in part and DENIED in part.

### Background

In April 1992, plaintiff TSN, a corporate entity established by Ronald Plasse ("Plasse") to acquire and operate travel agencies, entered into an agreement to purchase Kaplan Travel Bureau. In order to finance this transaction, which purportedly required a cash payment of $250,000 at closing, Plasse approached George Gochis ("Gochis") of Presidential.

On June 23, 1992, Presidential and TSN entered into a loan and security agreement by which Presidential agreed to provide financing to TSN based upon, and secured by, the accounts receivable from several of TSN's principal corporate customers. The loan agreement set a maximum limit on the advance funds that TSN could obtain from Presidential equal to 60% of TSN's select customer account receivables, or approximately $250,000. These funds were to be used by TSN for a revolving line of credit and to finance the purchase of Kaplan Travel, which was to occur on August 3, 1992.

By the terms of the Agreement, Presidential set forth several restrictions on its willingness to advance funds. First, Presidential required first-priority security interests in the receivables of TSN's select corporate customers. Second, Presidential required select customers of TSN to make payments due to TSN directly to Presidential. Third, Presidential insisted that it be given sole discretion over whether and when advances were

made. In addition, pursuant to the Agreement, TSN was required to execute a Demand Promissory Note, in which TSN promised to pay on demand to Presidential the principal amount of $250,000 and any interest thereon. The Agreement also set forth several events that would constitute default by TSN. These events were as follows: if (1) any receivable was not paid in full within 91 days from the date that Presidential made an advance with respect thereto; (2) TSN became insolvent; (3) one of TSN's creditors took possession of collateral; or (4) Presidential deemed itself insecure.

With respect to the funds needed by TSN to purchase Kaplan Travel, Presidential and TSN entered into a separate Escrow Agreement on August 3, 1992. The Escrow Agreement established a special account allowing TSN to represent to Kaplan that the necessary funds would be available for the transaction. However, the Escrow Agreement did not provide for immediate disbursement of the funds, apparently giving Presidential time to determine whether TSN had acquired a collateral base sufficient to justify the advance of such funds. Notwithstanding the provisions of the Escrow Agreement, TSN maintains that Presidential made separate oral promises to advance $250,000 at the time of the closing of the Kaplan deal.

TSN purchased Kaplan Travel on August 3, 1992. Although the initial purchase agreement called for a cash payment of $250,000 to be made to Kaplan at the closing, no funds were released on that day. Plasse testified in his deposition that TSN and Kaplan agreed to postpone payment until a discrepancy between Kaplan's stated and actual receivables, which formed the basis of the purchase price, could be resolved. There is, however, no written record of this agreement to postpone.

On October 23, 1992, TSN and Presidential executed an amendment to the Escrow Agreement. This amendment stated, *inter alia*, that "no payments have been made by Presidential under the Escrow Agreement, nor was there any obligation upon Presidential to do so." At about the same time, Presidential began to advance funds to TSN under the Loan Agreement for the first time.

In late November or early December, TSN requested that its line of credit be increased from $250,000 to $500,000 in order to purchase Westport Travel Service. Presidential agreed, and TSN's advance rate was increased to 70% of receivables, or approximately $500,000. At this time, TSN executed a new promissory note for the increased amount. In December, 1992, using these funds, TSN successfully acquired Westport Travel.

In late December or early January, an internal auditor from Presidential visited TSN for the purpose of conducting a purportedly routine audit of TSN's books. This audit revealed problems with TSN's receivables. Due to errors by TSN's comptroller, who was later discharged, TSN had not received payment from its largest corporate customer for the month of November and, as a result, had insufficient funds to cover payments to its biggest creditor, Airlines Reporting Corporation ("ARC"). Based on this audit, Presidential advised TSN that it was going to restrict TSN's maximum line of credit to $275,000.

On January 15, 1993, ARC informed TSN by letter that $266,887.30 in checks drawn against TSN's account for payment had been dishonored and that TSN was in default of its agreement with the company. Because the default was never corrected, ARC later revoked the plates used by TSN to issue air travel tickets at TSN's Kaplan locations, which, TSN claims, resulted in negative publicity, damage to its reputation, and the loss of experienced employees. TSN did not notify Presidential of this default notice until late January or early February.

On February 19, 1993, Presidential formally notified TSN that TSN was also in default under the Loan Agreements. Presidential indicated that no further advances would be made until Presidential was satisfied that TSN could repay its outstanding ARC obligations. Three days later, TSN terminated its financing relationship with Presidential. As requested by TSN, Presidential repaid itself in full out of TSN's accounts receivable and forwarded all excess funds to TSN. On March 11, 1993, TSN entered into a new

financing arrangement with Banker's Capital. The terms of this arrangement were apparently less favorable to TSN than the Loan Agreements with Presidential. TSN claims that it ceased to be profitable as a result of this new financing arrangement and subsequently went out of business.

### Standard for Summary Judgment

In a motion for summary judgment, the moving party must initially demonstrate that there are no material facts in dispute and "[a]ll reasonable inferences and any ambiguities are drawn in favor of the non-moving party." *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Once the moving party has met its burden, "the non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir. 1995); *Celotex Corp. v. Catrett,* 477 U.S. 317, 332, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986). "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### Discussion

TSN contends that Presidential caused its financial demise by refusing to provide the $250,000 necessary for the Kaplan closing, failing to advance funds in a timely manner in January and February of 1993, and failing to provide sufficient notice of its intent to terminate TSN's financing. TSN states these claims in terms of (1) breach of contract, (2) breach of an implied covenant of good faith and fair dealing, (3) breach of fiduciary duty, (4) negligent misrepresenta-

tion, (5) fraudulent misrepresentation and nondisclosure, and (6) violation of Connecticut's Unfair Trade Practices Act ("CUTPA"). Presidential moves for summary judgment as to all of plaintiff's claims.

### Count One (Breach of Contract)

In its first count, TSN claims that Presidential breached a binding agreement by refusing to advance $250,000 cash for the purchase of Kaplan Travel on August 3, 1992. TSN does not claim that this advance was required by the terms of its written agreements with Presidential; rather, TSN contends that there were separate oral agreements between itself and Presidential concerning the Kaplan deal.

TSN's breach of contract claim must navigate a treacherous path between the Scylla of the statute of frauds and the Charybdis of the parol evidence rule. Plaintiff concedes that the alleged oral promise to loan $250,000 for the closing cannot stand on its own, or it would run afoul of the statute of frauds, which requires certain contractual obligations to be set forth in writing in order to be enforceable. (Pl.'s Mem. in Opp., at 11–12.) Therefore, the oral agreement must be premised on some form of written documentation. Nor can the plaintiff rely on oral representations made prior to the June 23 Loan Agreements, for evidence of such oral representations would be barred under the parol evidence rule. Accordingly, plaintiff's oral contract theory is framed as a *subsequent* modification to the *written* June 23 documents.

 Under Massachusetts law,[1] "the mode of performance required by a written contract may be varied by a subsequent oral agreement based upon a valid consideration." *Cambridgeport Savings Bank v. Boersner,* 413 Mass. 432, 439, 597 N.E.2d 1017 (1992). Notwithstanding Presidential's reliance on a provision of the Loan Agreements expressly disclaiming subsequent oral modification, such a provision "does not necessarily bar

1. The Loan Agreements specify that "[t]he substantive Laws of the State of Massachusetts shall govern the construction of this Agreement and the rights and remedies of the parties hereto." The parties do not dispute that validity of this choice-of-law provision and are in apparent agreement that the state-law issues raised by the present Motion for Summary Judgment are appropriately decided under Massachusetts law.

oral modification of the contract." *Id.* However, TSN's claim fails on other grounds. As an initial matter, the Court notes that TSN has nowhere provided evidence as to "valid consideration" passed for the alleged oral modification of the contract; indeed, the Court does not even see a response to this issue in TSN's memoranda. Presidential is entitled to summary judgment on this point alone, for TSN has simply raised no genuine dispute as to Presidential's claim that any oral assurances of payment at the closing were not supported by valid consideration.

Moreover, TSN's theory runs into additional parol evidence rule problems in the form of the August 3 Escrow Agreement, which sets forth the terms under which Presidential would finance the purchase of Kaplan. Because the alleged oral agreement concerning the Kaplan financing was allegedly completed in July, the Escrow Agreement was undeniably subsequent to any of the oral representations at issue. As plaintiff concedes, the parol evidence rule precludes reliance on oral representations that are prior in time to an integrated agreement. (Mem. in Opp., at 11.) *See also Merillat Industries, Inc. v. Johnston,* 865 F.Supp. 60, 64 (D.Mass. 1994); Restatement (Second) of Contracts § 213 (1981). Plaintiff has not attempted to argue that the Escrow Agreement is anything but an integrated agreement, and the Court finds it to be so. *See* Restatement (Second) of Contracts § 209(1) (defining "integrated agreement" as "writing or writings constituting a final expression of one or more terms of an agreement"). The Escrow Agreement provides for the full amount owing to Kaplan ($440,000) to be paid by Presidential in 29 weekly installments. (Def.'s Statement of Material Facts, Ex. A.) Paragraph Six states, "This instrument contains the full agreement of the parties hereto as to the matters set forth herein, and no representations, oral or otherwise, negotiations, or other discussions made prior to the execution hereof shall have any force or effect." The Escrow Agreement plainly contradicts any oral representations made by Presidential to the effect that there would be a $250,000 disbursement to finance the Kaplan deal at the closing. "A binding integrated agreement discharges prior agreements to the ex-

tent that it is inconsistent with them," Restatement (Second) of Contracts § 213(1), and evidence of prior agreements or negotiations is not admissible to contradict terms of the later agreement, Restatement (Second) of Contracts § 215. Accordingly, the Court cannot conclude other than that the Escrow Agreement constituted the full agreement of the parties with respect to the financing of the Kaplan deal, and that defendant is therefore entitled to summary judgment as to plaintiff's claim of breach of oral contract.

*Count Two (Breach of Implied Covenant of Good Faith and Fair Dealing)*

In its second count, TSN claims that Presidential breached a covenant of good faith and fair dealing. Presidential does not dispute that such a covenant is implied in every contract, or that a breach of such a covenant is actionable. Rather, Presidential argues that it did nothing but exercise its express rights under the lending agreement and that, accordingly, it cannot be held liable for breach of the implied covenant. Presidential contends that, as a matter of law, a lender does not breach the implied covenant when it exercises its rights under a demand note and revolving credit agreement to refuse further extensions of credit and to demand payment on outstanding balances, regardless of the lender's good faith in so doing.

TSN responds that its claim encompasses not just the fact that Presidential terminated its financing, but also the *manner* in which Presidential exercised its rights. TSN contends that Presidential significantly slowed the speed with which funds were advanced on TSN's accounts receivable in January and February of 1993, while continuing to take in payments directly from TSN's chief customers. In consequence, TSN's outstanding debt was "virtually" erased in the space of a few weeks. TSN argues that, for all intents and purposes, Presidential called in its debt during that time, but without providing any formal notice to TSN so that TSN could arrange alternative financing. TSN further claims that Presidential falsely denied its intentions in response to repeated direct inquiries during the January and February time period.

■ An examination of the lending agreements indicates that Presidential expressly reserved for itself the right to extend loans in its "sole discretion" (Def.'s Ex. E, ¶ 1), TSN expressly waived "demand, presentment, notice, protest, and notice of dishonor" (Def.'s Ex. B), and TSN was obligated to "pay on demand" any balances due under the agreements (Def.'s Ex. B). In light of these express contractual provisions, Presidential may not be held liable merely for slowing the rate at which it advanced money to TSN, reducing the outstanding balance of TSN's debt, or declining to advance additional funds after February 19, 1993. *See Shawmut Bank, N.A. v. Miller*, 415 Mass. 482, 614 N.E.2d 668, 669 (1993) ("[G]ood faith is not a necessary component of a holder's decision to collect the balance due on a demand note."); *Shawmut Bank, N.A. v. Wayman*, 34 Mass. App.Ct. 20, 606 N.E.2d 925, 928 (1993) (holding that covenant of good faith and fair dealing does not require lender to provide notice concerning loans to individual who expressly waived notice in contract). However, TSN's claims appear less directed towards these actions per se, and more towards Presidential's failure to provide reasonable notice of its intentions and Presidential's deceptive responses to TSN's inquiries.

### A. Notice Claim

■ Although a lender does not violate the implied covenant of good faith and fair dealing merely by exercising express contractual rights, Massachusetts courts have left open the possibility that in certain circumstances lenders may violate the implied covenant by the *manner* with which they exercise express contractual rights. *See Miller*, 614 N.E.2d at 672 ("We, therefore, need not consider whether good faith is a necessary element of the setting of the terms of a demand for payment when dealing with a demand note...."); *cf. Shawmut Bank v. Flynn*, 1993 WL 818771, *3 (Mass.Super.) (noting, but not addressing, argument that *"Miller* only establishes the irrelevancy of Shawmut's good or bad faith and motivation in its decision to demand payment on the loan, but that *Miller* does not immunize the plaintiff's conduct in demanding or collecting payment").

■ In arguing that a cause of action exists for Presidential's failure to provide "reasonable notice" of its intentions to deny further credit and call in outstanding balances, TSN relies principally on *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985), which involved a revolving credit agreement similar to that entered into by Presidential and TSN. Although the lender in K.M.C. contended that it had a contractual right to refuse to extend credit and to demand payment at its own discretion, the Sixth Circuit, applying New York law, found that these rights did not relieve the lender of an obligation to provide prior notice of its intent to cut off credit. The court observed:

> As part of the procedure established for the operation of the financing agreement, the parties agreed in a supplementary letter that all receipts of K.M.C. would be deposited into a "blocked account" to which Irving would have sole access. Consequently, unless K.M.C. obtained alternative financing, a refusal by Irving to advance funds would leave K.M.C. without operating capital until it had paid down its loan. The record clearly established that a medium-sized company in the wholesale grocery business, such as K.M.C., could not operate without outside financing. Thus, the literal interpretation of the financing agreement urged upon us by Irving, as supplemented by the "blocked account" mechanism, would leave K.M.C.'s continued existence entirely at the whim or mercy of Irving, absent an obligation of good faith performance. Logically, at such times as Irving might wish to curtail financing to K.M.C., as was its right under the agreement, this obligation to act in good faith would require a period of notice to K.M.C. to allow it a reasonable opportunity to seek alternative financing, absent valid business reasons precluding Irving from doing so.

757 F.2d at 759.

Decided in 1985, *K.M.C.* has since been subjected to substantial criticism. *See, e.g., Kham & Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351, 1358 (7th Cir.1990). Although Massachusetts courts do not appear to have addressed whether the *K.M.C.* cause of ac-

tion is available under Massachusetts law, other state courts have consistently rejected the reasoning of *K.M.C.* or strictly limited the holding of *K.M.C.* to its facts. *See, e.g., Waller v. Maryland Nat'l Bank,* 95 Md.App. 197, 620 A.2d 381, 391 (1993); *Gaul v. Olympia Fitness Center, Inc.,* 88 Ohio App.3d 310, 623 N.E.2d 1281, 1287 (1993); *Southwest Savings & Loan Ass'n v. SunAmp Systems, Inc.,* 172 Ariz. 553, 838 P.2d 1314, 1322 (Ct. App.1992); *Check Reporting Services, Inc. v. Michigan Nat'l Bank,* 191 Mich.App. 614, 478 N.W.2d 893, 899 (1991); *Creeger Brick & Building Supply, Inc. v. Mid–State Bank & Trust Co.,* 385 Pa.Super. 30, 560 A.2d 151, 154 (1989); *Pavco Industries, Inc. v. First Nat'l Bank of Mobile,* 534 So.2d 572, 577 (Ala.1988); *Flagship Nat'l Bank v. Gray Distribution Systems, Inc.,* 485 So.2d 1336, 1341 (Fla.Dist.Ct.App.1986); *Shaughnessy v. Mark Twain State Bank,* 715 S.W.2d 944, 953 (Mo.Ct.App.1986). Indeed, although *K.M.C.* purported to apply New York law, it is not clear that New York courts would recognize a cause of action in similar circumstances. *See Nat'l Westminster Bank v. Ross,* 130 B.R. 656, 680 (S.D.N.Y.1991) (concluding that *K.M.C.* is inconsistent with *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)).

Criticism of *K.M.C.* focusses on two aspects of the decision. First, the decision effectively overrode the express terms of the contractual arrangement between the parties. "Although courts often refer to the obligation of good faith that exists in every contractual relation, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document." *Kham & Nate's Shoes,* 908 F.2d at 1357. Moreover, debtors are not necessarily benefited when courts constrain the ability of creditors to exercise contractual rights. If creditors are not permitted to bargain for the added protection of being to able to act without notice, then creditors will demand higher interest rates and faster repayment, or may decline to ex-

tend credit altogether.[2] Mark Snyderman, Note, *What's So Good About Good Faith?: The Good Faith Performance Obligation in Commercial Lending,* 55 U. Chi. L.Rev. 1335, 1350–51 (1988); *see Amoco Oil Co. v. Ashcraft,* 791 F.2d 519, 524 (7th Cir.1986) ("The less protection [the creditor] has, the less willing it will be to extend credit").

Second, the court in *K.M.C.* found support for its conclusion in U.C.C. § 1–208, which states that "a term providing that one party . . . may accelerate payment or performance . . . 'at will' . . . shall be construed to mean that he shall have the power to do so only if he in good faith believes that the prospect of payment or performance is impaired." *See K.M.C.,* 757 F.2d at 760. However, the *K.M.C.* court failed to note that the official comment to § 1–208 states, "Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason." *See* Snyderman, *supra,* at 1354–55; *Miller,* 614 N.E.2d at 670.

In light of the weight and persuasiveness of the case law criticizing *K.M.C.,* or questioning its general applicability, the Court concludes that the Massachusetts Supreme Judicial Court would either interpret *K.M.C.* quite narrowly or reject its reasoning altogether. Assuming the former, the Court notes several distinguishing features between *K.M.C.* and the present case. First, the parties in *K.M.C.* had a longer course of dealings with one another than TSN and Presidential. K.M.C. and Irving Trust entered into their financing agreement in 1979, and Irving Trust apparently advanced funds under the agreement without serious incident until the refusal on March 1, 1981, which gave rise to K.M.C.'s cause of action. By way of contrast, TSN and Presidential entered into their agreement in June of 1992; Presidential refused to advance funds under the agreement until October of that year, (Plasse Aff., ¶ 15); TSN's line of credit was doubled in December of 1992, but cut nearly in half the following month, (Gochis Aff.,

---

**2.** TSN should have a particular appreciation for the protections demanded by creditors when advancing funds to at-risk enterprises: TSN's subsequent financing arrangement with Bankers Capital was apparently so expensive that TSN could no longer operate profitably. (Pl.'s Mem. in Opp., at 9.)

¶ 16);[3] and financing was effectively terminated in February of 1993. TSN itself characterizes its "lending relationship" with Presidential as lasting only four months. (Pl.'s Mem. in Opp., at 5.) Indeed, none of the evidence before the Court suggests that the relationship between TSN and Presidential was anything but short and tempestuous. TSN cannot claim, and does not appear to claim, that it was lulled into a belief that Presidential would provide advance notice of any change in TSN's status merely by virtue of the course of past dealings between the parties.[4] Whatever disclosure obligations may arise in the context of a long, stable relationship, such obligations are not necessarily present in this case.

*K.M.C.* is further distinguishable on other grounds. While the *K.M.C.* court found evidence that K.M.C.'s business was stable and that "March 1 was simply not that unusual a day in the history of the relationship between Irving and K.M.C.," 757 F.2d at 762, the undisputed evidence in this case is that ARC, TSN's most important creditor, provided notice to TSN that it was in default on its obligations on January 15, 1993, which default was not rectified prior to the termination of Presidential's financing; also in January, problems were becoming apparent with respect to the accounts receivable from Pfizer, one of TSN's most important customers, (Gochis Aff., ¶ 14); and, at about the same time, Presidential notified TSN that its credit line would be reduced from $500,000 to $275,000. In short, the Court would be hard pressed to conclude that the January–February time period at issue "was not that unusual a [time] in the history of" the financing arrangements between TSN and Presidential. Nor could the Court conclude that, absent affirmative misrepresentations by Presidential, TSN would have acted reasonably to assume that its financing arrange-

ments with Presidential would go unchanged during the relevant time period.

Finally, the Court notes that circumstances in the *K.M.C.* case suggested a level of maliciousness on the part of the creditor that is not apparent in this case. Indeed, in *K.M.C.*, there was persuasive evidence that the creditor acted out of personal dislike for the debtor, 757 F.2d at 761, and that the creditor knew that its collateral was secure, but actually intended to "destroy" the debtor by terminating financing, *id.* at 762. The record in this case contains no comparable evidence.

In light of the important distinctions between the facts of this case and the facts of *K.M.C.*, as well as the likelihood that Massachusetts courts would at most interpret *K.M.C.* narrowly, the Court concludes that the provisions of the Loan Agreements and related documents, including the express waiver of notice, preclude a cause of action under the implied covenant of good faith and fair dealing for Presidential's alleged failure to provide TSN with advance notice of its intent to significantly restrict or terminate TSN's line of credit in January and February of 1993. Accordingly, Presidential is entitled to summary judgment on this issue.

**B. Deception Claim**

Although TSN may not proceed merely on the claim that Presidential failed to provide reasonable notice of its intent to terminate financing, TSN offers the additional claim, backed by affidavit, that Presidential falsely responded to direct inquiries that TSN's credit line was in no danger in January and February of 1993. (Plasse Aff., ¶ 21; Ebeltoft Aff, ¶ 15.) Drawing all inferences in TSN's favor, as the Court must in a motion for summary judgment, the virtual elimina-

---

3. Although the alleged notification of TSN in January of Presidential's intent to reduce TSN's credit line is not evidenced by writing, TSN does not appear to dispute that such notice was provided or that its credit line was so reduced. The present suit does not seem to challenge this reduction in TSN's credit line, but rather the alleged additional reductions that occurred *sub silencio* in January and February.

4. Indeed, such a claim would be belied by TSN's assertion that it made "repeated inquiry" of Presidential concerning the security of its credit line during January and February of 1993. (Pl.'s Mem. in Opp., at 6.) Of course, while the nature of its relationship with Presidential could not have reasonably "lulled" TSN into a false sense of security, specific misrepresentations by Presidential might have. TSN's claims in this regard are discussed *infra*.

tion of TSN's outstanding balance during the January–February time period by process of delaying new advances, (Plasse Aff., ¶ 22), gives rise to an inference that Presidential intended to cut off or radically restrict TSN's financing *sub silencio*. Even if Presidential were under no obligation to give notice of its intentions, TSN argues that Presidential breached the implied covenant of good faith and fair dealing by falsely denying its intentions when directly asked.

 TSN's claim of active deception clearly stands on firmer ground than its lack of notice claim. While TSN expressly waived notice in the lending agreements, Presidential has not identified any contractual basis for a right to respond falsely to direct inquiries. More generally, the Court can identify no tension between the bargained-for terms of the lending agreement and an implied covenant not to respond falsely to TSN's questions about its status. "When the contract is silent, principles of good faith ... fill the gap." *Kham & Nate's*, 908 F.2d at 1357. Here, the contract appears to be silent as to Presidential's rights and obligations in responding to TSN's inquiries.

In the present case, Presidential should have been particularly sensitive in its handling of TSN's inquiries in light of the waiver of notice: TSN had no means other than regular inquiries to obtain advance warning of trouble in its financing arrangements and of the potential need to seek alternative financing elsewhere. TSN does not argue that Presidential was obligated to respond to its inquiries, but maintains that when Presidential chose to respond, Presidential became obligated to respond honestly. The Court agrees that dishonesty in these circumstances would violate the implied covenant of good faith and fair dealing. *Cf. Wayman*, 606 N.E.2d at 928 (concluding that creditor entitled to summary judgment on good faith and fair dealing claim because debtor failed to offer evidence "of any misrepresentation or dishonest act"); *Flynn*, 1993 WL 818771 at *3 (holding that evidence of misrepresentations by creditor might support conclusion of bad faith, but concluding that any such misconduct was immaterial). Accordingly,

Presidential's motion for summary judgment as to this claim is denied.

### C. Failure to Advance Funds Claim

TSN offers one final basis for its claim of breach of the implied covenant of good faith and fair dealing: Presidential's failure to adhere to its alleged oral promises to advance money at the time of the closing of the Kaplan deal. However, the Court has already held these alleged promises to be nonactionable as a matter of law by virtue of the subsequent Escrow Agreement.

### Count Three (Breach of Fiduciary Duty)

TSN, in its third count, contends that it and Presidential were in a fiduciary relationship and that Presidential breached its fiduciary duties. Presidential moves for summary judgment on this count, arguing that TSN has established neither the existence of a fiduciary relationship between the parties nor a breach thereof.

 Although Presidential concedes that the existence of a fiduciary relationship is a question of fact, Presidential contends that there is no genuine dispute in the present case as to the existence of such a relationship. A lender-debtor relationship generally does not give rise to a fiduciary relationship under Massachusetts law. *Flaherty v. Baybank Merrimack Valley, N.A.*, 808 F.Supp. 55, 65 (D.Mass.1992). TSN seeks to distinguish its arrangement with Presidential from the run-of-the-mill lending agreement by virtue of Presidential's "complete control of TSN's funds." (Pl.'s Mem., at 17.) Undoubtedly, by agreeing to such a financing relationship, TSN demonstrated a high degree of trust in its creditor; however, Massachusetts law is quite clear that "one party cannot unilaterally transform a business relationship into a fiduciary relationship by reposing trust and confidence in another." *Id.* (citations omitted)

The fundamental defect of TSN's claim is that TSN has offered no evidence that its financing arrangements were the result of anything but arm's-length business transactions with Presidential. *See Industrial General Corp. v. Sequoia Pacific Systems Corp.*,

44 F.3d 40, 44 (1st Cir.1995) (concluding that under Massachusetts law "business transactions conducted at arm's length generally do not give rise to fiduciary relationships"). The relationship between TSN and Presidential is clearly distinguishable from other business relationships that have been found to give rise to fiduciary duties under Massachusetts law. For instance, in the leading case of *Broomfield v. Kosow*, the Supreme Judicial Court found that a fiduciary relationship existed where the debtor and creditor had a close business and social relationship; all documents were prepared by the creditor's counsel and signed by the debtor without even reading them; the debtor followed the creditor's instructions and advice throughout the relationship, and knew nothing of the details of the loans; the creditor had an "intimate, personal, first-hand knowledge" of the debtor's business, while the debtor had little knowledge about construction loans; and the creditor had taken advantage of the "great disparity" in the parties' positions in order to gain "unjust enrichment" at the debtor's expense. 349 Mass. 749, 212 N.E.2d 556 (1965). The factual record of the present case, however, indicates no such extreme and unusual circumstances.

Based on *Broomfield* and other Massachusetts cases, the First Circuit recently suggested the following criteria for determining whether a business relationship gives rise to a fiduciary relationship: "defendant's knowledge of the plaintiff's reliance ... the relation of the parties, the plaintiff's business capacity contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge.'" *Industrial General Corp.*, 44 F.3d at 44. Reviewing these factors, the Court finds no evidence in the record to suggest that the relationship between TSN and Presidential was anything but a business relationship, that Presidential possessed a superior business capacity, that TSN relied significantly on Presidential's guidance in complex transactions, or that Presidential had "specialized knowledge" relevant to the financing deals at issue. Indeed, the record indicates that Presidential had no prior experience with financing a travel agency. (Plasse Aff., ¶ 8.) Although Presidential may have had some knowledge of the importance to TSN of timely advances of funds, (Plasse Aff., ¶ 8), TSN has conceded that Presidential never expressly agreed to enter into a "relationship of trust and confidence." (Plasse Depo., Def.'s Ex. Y, at 125.) In sum, TSN has not offered evidence suggesting there to be a genuine dispute as the presence of the indicia of a fiduciary relationship in the commercial context. Accordingly, the Court concludes that Presidential did not stand as a fiduciary to TSN, and summary judgment is granted as to Count Three.

*Count Four (Negligent Misrepresentation)*

In Count Four, TSN alleges that Presidential made false and misleading statements regarding TSN's credit line with the intent to induce TSN to rely on such statements. Specifically, TSN points to the alleged oral agreement between the parties regarding the cash advance for the purchase of Kaplan Travel and the statements made during January and February of 1993 allegedly assuring TSN that its line of credit was not in danger. Presidential responds that it was only exercising its contractual rights in declining to advance funds for the Kaplan deal and in acting as it did during the January–February period.

■■■■ As discussed above, any oral representations made in July 1992 that funds would be disbursed at the closing of the Kaplan deal are nonactionable in light of the subsequent written agreement governing financing of the deal. The fact that Count Four sounds in tort, rather than contract, does no alter this conclusion. As the First Circuit has observed in rejecting a fraudulent misrepresentation claim under Massachusetts law:

[A] contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable business people—to pause. Moreover, if a jury is allowed to ignore contractual provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter any more.... And the give-and-take of negotiations

would become meaningless if, after making concessions in order to obtain other contractual protections, a knowledgeable party is later able to reclaim what it had given away by alleging that it had, in fact, relied not on the writing but on the prior oral statements. Thus, in weighing the competing interests, the Massachusetts Supreme Judicial Court undoubtedly would find that the threat to contractual certainty usually would outweigh the possible injustice of denying a claim of fraud.

*Turner v. Johnson & Johnson,* 809 F.2d 90, 96 (1st Cir.1986). *See also Starr v. Fordham,* 420 Mass. 178, 648 N.E.2d 1261, 1267 (1995) (citing *Turner* for proposition that if "the contract was fully negotiated and voluntarily signed, [then] plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue"). The case might be different if TSN claimed that it was fraudulently induced into signing the Escrow Agreement, *see McEvoy Travel Bureau, Inc. v. Norton Co.,* 408 Mass. 704, 563 N.E.2d 188 (1990); however, such a claim is not part of this case.

While TSN's claim of negligent misrepresentation may not proceed with respect to the alleged oral promises to advance funds at the time of closing of the Kaplan deal, a different analysis obtains with respect to the alleged misrepresentations prior to the termination of financing. As discussed above, the Court finds Presidential's argument that it was only exercising its contractual rights to be unavailing. TSN has presented a genuine, material dispute as to whether Presidential misrepresented the security of TSN's credit line during the January–February period, and as to whether TSN reasonably relied on such misrepresentations to its detriment. Accordingly, Presidential is not entitled to summary judgment on this aspect of Count 4.

### Count Five (Fraudulent Misrepresentation and Nondisclosure)

TSN's fifth count presents claims for fraudulent misrepresentation and nondisclosure. The parties' briefs have not distinguished between the claims of negligent and

fraudulent misrepresentation. Accordingly, the Court reaches the same conclusion reached in Count 4: TSN's claims of fraudulent misrepresentation may only proceed insofar as they challenge misrepresentations concerning the security of TSN's credit line during the January–February period.

■ TSN's claims of fraudulent nondisclosure are premised on a duty to disclose arising from the implied covenant of good faith and fair dealing and Presidential's alleged fiduciary duties to TSN. TSN again relies heavily on the Sixth Circuit's decision in *K.M.C.* However, the Court concluded above that Presidential neither owed a fiduciary duty to TSN nor was obligated by the implied covenant to disclose its intentions with respect to TSN's credit line any earlier than it did. Accordingly, in the absence of any actionable duty to disclose, Presidential is entitled to summary judgment as to TSN's claims of fraudulent nondisclosure.

### Count Six (CUTPA)

In its last count, TSN claims that Presidential violated Connecticut's Uniform Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110a. Presidential contends that CUTPA does not apply because the agreements at issue specify that disputes should be resolved under Massachusetts, not Connecticut, law. TSN has not addressed this argument.

■ The applicability of CUTPA is governed by whether Connecticut law would be applied under the choice-of-law rules of the forum state, which in this case is Connecticut. *Bailey Employment System, Inc. v. Hahn,* 655 F.2d 473, 475–76 (2d Cir.1981); *USGI, Inc. v. Michele Limited Partnership,* 16 Conn. L. Trib. 24, 25 (D.Conn.1990) (Cabranes, J.). Connecticut courts give "effect to an express choice of law by the parties to a contract provided that it was made in good faith." *Elgar v. Elgar,* 238 Conn. 839, 848, 679 A.2d 937 (1996). A broadly-worded choice-of-law provision in a contract may govern not only interpretation of the contract in which it is contained, but also tort claims arising out of or relating to the contract. *Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 309–10 (2d Cir.1994). TSN has

nowhere in its briefs challenged Presidential's contentions as to the validity or scope of the choice-of-law provision in the loan agreements. Indeed, to all appearances, TSN concedes that Massachusetts law governs its tort claims. For instance, TSN repeatedly cites Massachusetts authority with respect to its claims for negligent and fraudulent misrepresentation, but never once refers to a Connecticut case. (Pl.'s Mem. in Opp., at 19–24.) TSN is "not able to pick and choose which portions of Connecticut law are applicable." *USGI*, 16 Conn. L. Trib. at 25. In light of TSN's reliance on Massachusetts law elsewhere, as well as TSN's failure to contest Presidential's interpretation of the choice-of-law provision, the Court concludes that the choice-of-law provision mandates application of Massachusetts law to all claims arising out of or connected to the Loan Agreements. Accordingly, TSN may not proceed with its claims against Presidential under CUTPA.

### Conclusion

For the foregoing reasons, defendant Presidential's Motion for Summary Judgment (Doc. 27) is GRANTED in part and DENIED in part. Specifically, Presidential is entitled to summary judgment with respect to all of plaintiff's claims other than the claims for breach of implied covenant of good faith and fair dealing, negligent misrepresentation, and fraudulent misrepresentation arising from the alleged misrepresentations concerning plaintiff's credit line in January and February of 1993.

IT IS SO ORDERED.